IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND, NORTHERN DIVISION

DAVID K. MARTIN,

        Plaintiff,

           v.                    CIVIL NO.: WDQ-11-0881

CHRISTOPHER CONNER, *et al.*,

        Defendants.

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

MEMORANDUM OPINION

    David Martin sued law enforcement officers Christopher Conner and Jeremiah Gussoni (collectively, "the defendants") for civil rights violations. For the following reasons, the defendants' motion to dismiss or for summary judgment will be granted in part and denied in part.

I.   Background[1]

    Martin, an African-American resident of Philadelphia, Pennsylvania, regularly travels to the Baltimore, Maryland area via Interstate 95 to visit his fiancée's family and friends. ECF No. 1 ¶5.

---

[1] For the motion to dismiss, the well-pled allegations in Martin's complaint are accepted as true. *Brockington v. Boykins*, 637 F.3d 503, 505 (4th Cir. 2011). For the motion for summary judgment, the non-movant's evidence "is to be believed, and all justifiable inferences are to be drawn in [its] favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

A.   The October Stop

On October 12, 2009, at 11:09 a.m., Trooper First Class (TFC) Gussoni, a Trooper with the Maryland State Police ("MSP"),[2] stopped Martin in a rented purple Hyundai ("the Hyundai") on Interstate 95 ("I-95" or "the interstate") Southbound near mile marker 97.5 in Cecil County, Maryland for speeding, making an unsafe lane change, following another vehicle too closely, and negligent driving. *Id.* ¶8.  TFC Gussoni's dashboard camera recorded the stop. ECF No. 7 Attach. 4 ¶36.[3]  TFC Gussoni contends that his laser showed Martin's car going 75 miles per hour, 10 miles per hour above the speed limit. *Id.* ¶¶3-4. Martin contends that he did not commit the infractions. ECF No. 14 Attach. 3 ¶5.

TFC Gussoni, speaking to Martin through the passenger side front window, told Martin he could not hear him and asked him to exit the car. ECF No. 14 Attach. 5.  Martin refused several times, and TFC Gussoni ordered him out of the car. *Id.*  Martin eventually agreed to get out of the car, after his girlfriend LaShonda Baker got out, and he climbed through the passenger

---

[2] TFC Gussoni is now a Special Agent with the United States Department of Homeland Security. ECF No. 7 Attach. 4 ¶1.

[3] Martin does not dispute that the video accurately reflects the events of the stop; he submitted the video in support of his opposition to the motion for summary judgment. ECF No. 14 Attach. 5.

seat to avoid the interstate traffic.  *Id.* TFC Gussoni told
Baker she "c[ould] have a seat back in the car."  *Id.*

Martin asked TFC Gussoni why he had been pulled over, and
TFC Gussoni told Martin he would tell him "in a second," but he
didn't understand why Martin had refused to get out of the car.
*Id.*  TFC Gussoni then said, "for my safety, I have to pat you
down for weapons.  Do you have any weapons on you?"  Martin
asked why TFC Gussoni had to pat him down; TFC Gussoni said "for
weapons."  TFC Gussoni patted Martin down, finding nothing.  TFC
Gussoni told Martin that he saw him speeding before exiting I-
95; "you've got to slow down . . . you've got to be careful,"
TFC Gussoni told him.  *Id.*

Martin told TFC Gussoni that he was taking Baker home, then
returning to Philadelphia.  He was driving a rental car, and
showed TFC Gussoni the rental agreement, stating that the car
was due back in Philadelphia later that day.  *Id.*  TFC Gussoni
asked Martin why he was "so nervous," and said it made him
nervous to see Martin nervous.  *Id.*  TFC Gussoni then took
Martin's driver's license and rental agreement, told him he
planned to give him a warning, and took the documents to his
police car to check them.  *Id.*  A moment later, TFC Gussoni
returned to Martin, confirmed his identity, and asked if he had
ever been stopped before.  Martin responded that he had, but had
never been asked to get out of his car.  *Id.*

3

Martin again said that he was dropping Baker off in Baltimore, in Gwynn Oak, and said he did not know how to get there, but knew he had to take Interstate 695. *Id.* In response to TFC Gussoni's questions, Martin told TFC Gussoni that he worked as an "X-ray tech" and that there were no firearms in the car. TFC Gussoni said that he asked about firearms because he noticed that Martin was wearing a Glock lanyard.[4] Martin admitted that he owned a 9 mm Glock compact. Martin and TFC Gussoni discussed Martin's job for about 30 seconds, then TFC Gussoni told Martin he was going to check the Hyundai's registration. TFC Gussoni looked at the Hyundai's front windshield, then spoke to Baker, who was sitting in the front passenger seat. *Id.*

Baker told TFC Gussoni she was going to Baltimore; TFC Gussoni asked what she planned to do; her response is inaudible. *Id.* TFC Gussoni can be heard asking, "and you guys are going to stay down there for the week?" and mentioning "your [Baker's] family." *Id.* TFC Gussoni checked Baker's identification, then returned to Martin. *Id.* He again asked Martin how long "you guys" were staying in Baltimore; Martin responded that he was "driving her up, then coming right back to Philly." *Id.* Martin said Baker had lived in Maryland for three years. *Id.*

---

[4] Glock is an Austrian firearms manufacturer. *See* ECF No. 14 Attach. 22 at 2.

At 11:18 a.m., TFC Gussoni returned to his patrol car.  He called for backup, asking for a "scan," and called his barracks to check the license plates of the Hyundai.  *Id.*  At 11:21, Sergeant (Sgt.) Conner and TFC McCurdy arrived at the stop.  One of the officers noticed that Martin had a Bluetooth earpiece[5] in his ear.  *Id.*  TFC Gussoni stayed in his car, reporting Martin's name to the barracks so that police could determine whether he was the subject of any arrest warrants.  *Id.*

On the video, Sgt. Conner can be seen speaking to Martin in front of the patrol car.  *Id.*  Sgt. Conner was concerned about the Bluetooth because "suspects can use cell phones to call for assistance" and Martin "appeared to be talking discreetly into" the device, seemed nervous, and was pacing.  ECF No. 17 Attach. 1 ¶7.  Sgt. Conner saw Martin "furtively checking his waist with his forearm," a "gun checking movement . . . to ensure that a gun does not drop from the waistband."[6]  *Id.* ¶8.  Sgt. Conner asked Martin if he could frisk him; Martin said Sgt. Conner's partner had already done so, then raised his hands "to allow [Sgt. Conner] to search his body, which [Sgt. Conner] believed meant he consented to the search."  *Id.* ¶9.

---

[5] Bluetooth technology allows computerized devices to exchange data wirelessly over short-wave radio frequencies.  Collins English Dictionary, 2009 (10th Ed.).

[6] Martin was not in camera view when he allegedly made the furtive movements.  ECF No. 14 Attach. 5.

The video recording shows Martin raising his hands, and Sgt. Conner frisking Martin, but the conversation is inaudible. ECF No. 14 Attach. 5. About five seconds later, Sgt. Conner moved Martin to the hood of the patrol car and removed a Glock 9mm handgun from Martin's waistband. *Id.* TFC McCurdy held Martin down, and TFC Gussoni, who had joined the other officers in front of his car, handcuffed Martin on Sgt. Conner's order. *Id.* TFC McCurdy and Sgt. Conner removed Baker from the car and handcuffed her. *Id.* Less than 90 seconds passed between Sgt. Conner's arrival and Baker's handcuffing. *Id.*

TFC Gussoni held Martin against the hood of the patrol car while Sgt. Conner and TFC McCurdy handcuffed Baker. Martin indicated that he understood he could have shot himself; he was otherwise silent. *Id.* An officer asked Martin if he was permitted to carry a handgun. He said yes, but he did not know what state. He shook his head from side to side when asked whether he was permitted to carry a gun in Maryland. *Id.* The officer responded, "I need to know . . . whether you're permitted to carry in Maryland." *Id.*

At 11:25, a drug-sniffing dog alerted to the trunk of the Hyundai. *Id.* Two of the officers searched the Hyundai, finding no contraband but noticing that the trunk was covered in "laundry detergent, almost." *Id.*

At the time of the arrest, Martin had a Florida concealed firearm permit in his wallet. ECF No. 7 Attach. 4.  He "had nothing in his possession regarding [other] licenses or permits and refused to provide any information to" the officers.  *Id.* ¶30.  TFC Gussoni issued Martin a warning for the traffic violations.  ECF No. 14 Attach. 4.

On the afternoon of the stop, Cecil County District Court Commissioner Jessica Smith reviewed TFC Gussoni's statement of probable cause and charged Martin with possessing a handgun on his person and knowingly transporting a handgun in a vehicle, each a Maryland offense punishable by up to three years imprisonment.  ECF No. 7 Attach. 8 at 1-2.

On October 14, 2009, TFC Gussoni ran the Glock's serial number through the Bureau of Alcohol, Tobacco, and Firearms ("ATF") Etrace system, which documents the ownership history of firearms.  ECF No. 14 Attach. 7 at 4; ECF No. 14 Attach. 22 at 2.  On November 2, 2009, ATF completed the trace; TFC Gussoni saw the results on November 20, 2009.  ECF No. 14 Attach. 22 at 2; ECF No. 14 Attach. 7 at 4.  The report states that on April 19, 2005, the Glock was shipped to Ciampolis Gun Shop in New Castle, Pennsylvania; on July 7, 2005, Clinton Saines, of New Castle, Pennsylvania, bought the Glock from Ciampolis; and on October 12, 2009, it was recovered on Martin.  The report does not indicate when or from whom Martin bought the gun.  ECF No.

7

14 Attach. 22 at 2.  Martin's purchase agreement states that he bought it at Ciampolis on June 10, 2006.  ECF No. 14 Attach. 8.

After November 20, 2009, TFC Gussoni contacted ATF and asked for more information about the trace.  An agent told him that Saines was a suspected straw purchaser of firearms because of four handguns traceable to Saines, three had been recovered after use in violent crimes.  ECF No. 14 Attach. 7 at 4.  TFC Gussoni says that the ATF asked for more time to investigate Saines and Martin and told him they might be charged federally for gun trafficking crimes.  *Id.*  TFC Gussoni "requested that the case be nolle prossed" so that ATF and he could further investigate Martin.  *Id.*

On December 9, 2009, the Cecil County State's Attorney's office *nolle prossed* the charges.  ECF No. 14 Attach. 31.

B.   The December Stop

On December 9, 2009, after leaving the Cecil County Courthouse, Martin was again stopped on I-95 Southbound, at the 97.5 mile marker.[7]

---

[7] Before the December stop, Martin purchased a Smart Black Box: a tool that records a video of the view from the dashboard of a car and uses GPS technology to record and track the car's location and speed during travel.  ECF No. 14 Attach. 11 at 11. Martin installed it in the Kia, and it recorded him traveling at 50 to 66 miles per hour from some point before he passed Sgt. Conner until he slowed for the stop.  ECF No. 14 Attach. 12.

Sgt. Conner's laser, which indicated that it was in proper working order and "shuts down and does not allow any speed readings" when it malfunctions, indicated that a black Kia Spectra ("the Kia") with Florida license plates was driving 73 miles per hour in the 65 mile per hour zone. ECF No. 17 Attach. 1 ¶¶16-17. As it passed him, Sgt. Conner noticed that the Kia slowed to about 45 miles per hour and moved into the middle lane.[8] *Id.* ¶17. Sgt. Conner then decided to stop the Kia. At that time, he "did not know the race or age of the driver." *Id.* ¶18. Martin contends that he was not speeding and did not slow below 45 miles per hour as he passed Sgt. Conner. ECF No. 14 Attach. 3 ¶17.

Sgt. Conner's dashboard camera recorded the stop. ECF No. 17 Attach. 1 ¶25.[9] The video, starting at 9:49 a.m., shows Sgt. Conner approaching the Kia on the passenger side and speaking with Martin through the front passenger window. ECF No. 14 Attach. 13. About 45 seconds into the stop, Sgt. Conner noted that Martin "look[ed] awful familiar," and recognized Martin from the October stop. Martin was driving a rental car, and he gave Sgt. Conner the rental agreement and his license. *Id.*

---

[8] Sgt. Conner did not indicate from which lane the car moved. ECF No. 17 Attach. 1 ¶¶16-17.

[9] Martin does not dispute that the video accurately recorded the stop; he submitted the video in support of his opposition to the motion for summary judgment. ECF No. 14 Attach. 13.

Because Sgt. Conner remembered that Martin had a gun the last time he was stopped, he asked Martin to get out of the car for a frisk to "make sure" he did not have a gun. *Id*. After the frisk, Martin asked Sgt. Conner why he had been pulled over. Sgt. Conner responded that Martin came "around the corner and [Martin was] speeding, and you slowed way down." *Id*. Martin told him that he was on his way to pick up his girlfriend in Baltimore. *Id*.

Sgt. Conner returned to his patrol car and called TFC Gussoni to confirm that Martin had been arrested at the same place in October. *Id*. Sgt. Conner told TFC Gussoni that he smelled a "faint odor of burnt marijuana coming out" of Martin's car. *Id*. Martin did not smell marijuana and had not smoked marijuana in the Kia. ECF No. 14 Attach. 3 ¶20.

Sgt. Conner requested backup, then returned to Martin. Martin told him that he was an unemployed former X-ray technician, and planned to visit his girlfriend for two hours in Gwynn Oak. ECF No. 14 Attach. 13. Martin said he was the only person who had used the car since he rented it. *Id*. Sgt. Conner returned to his car at 9:59 a.m. and stated that Martin was "absolutely scared to death"; Sgt. Conner did not want to tell him he smelled marijuana in the car because he feared Martin would start a fight. *Id*.

Backup arrived at 10:01 a.m.  Sgt. Conner told Martin he had smelled marijuana in the Kia, and searched the car.  *Id.* The backup officer brought a drug-sniffing dog, but Sgt. Conner did not use it because he had already smelled marijuana.  ECF No. 17 Attach. 1 ¶23.  Sgt. Conner found no contraband in the car, and gave Martin another warning.  *Id.* ¶18.  Martin was allowed to return to the Kia at 10:08 a.m.  The stop lasted 23 minutes.  ECF No. 14 Attach. 13.

C.   The Gun Trafficking Charge

On February 18, 2010, Martin submitted a Public Information Act ("PIA") request to MSP, requesting

> record(s), document(s), file(s), communications, memorandum(a), order(s), agreement(s) and/or instruction(s), created, used, or in place[] on December 9, 2009 and thereafter in regard to [the stop].

ECF No. 14 Attach. 19.  MSP received the request on March 1, 2010.  *Id.*

On March 2, 2010, TFC Gussoni followed-up with ATF.  ATF told him that "due to lack of further investigative leads," there would not be a federal prosecution related to the gun. ECF No. 14 Attach. 7 at 4.  TFC Gussoni states that he was not aware of the PIA request when he contacted ATF.  ECF No. 7 Attach. 4 ¶28.

On March 3, 2010, Martin submitted a PIA request for information about the October 12, 2009 stop.  ECF No. 14 Attach.

11

20.   TFC Gussoni says that he was not aware of the request.   ECF
No. 7 Attach. 4 ¶28.

On March 4, 2010, TFC Gussoni told an investigator and an
Assistant State's Attorney from Cecil County that he believed
"Martin was transporting the seized Glock 26 for unlawful sale
or trafficking."   ECF No. 14 Attach. 7 at 5.   The prosecutor
agreed with TFC Gussoni, and "requested that [TFC Gussoni] apply
for charges against Martin" for (1) transporting a handgun on
his person; (2) knowingly transporting a handgun in a vehicle on
the highways;--the two original charges—and (3) transporting a
regulated firearm for unlawful sale or trafficking.   *Id.* at 5.
TFC Gussoni did not know that Martin had a permit to carry a
firearm in Pennsylvania.   ECF No. 7 Attach. 4 ¶30.

On March 5, 2010, MSP received Martin's PIA request for the
October stop.   ECF No. 14 Attach. 20.

On March 19, 2010, TFC Gussoni filed the charge applica-
tion.   ECF No. 14 Attach. 7 at 1.   In the application he stated
that (1) on October 12, 2009, he was stationed at mile 101 on I-
95, facing the southbound traffic, saw the Hyundai "traveling
faster than the other vehicles," and his laser indicated that
the Hyundai was traveling at 75 miles per hour[10] when it was
about 1,200 feet from him; (2) after the Hyundai passed him, he

---

[10] TFC Gussoni stated that he was certified to operate the laser
and it was working at the time.   ECF No. 14 Attach. 7 at 2.

pulled into traffic, and "noticed that the vehicle increased its speed and quickly exited off the Interstate onto Exit 100. This abrupt action caused a following vehicle to nearly run off the roadway"; (3) a few minutes later, he saw the Hyundai return to I-95 at the 99 mile marker and follow "less than one-half car's length from the preceding" car; (4) when he began to pursue the Hyundai, it "slowed to less than 55 miles per hour"; (5) he activated his emergency lights "for the traffic violations of" speeding, unsafe lane change, following another vehicle too closely, and negligent driving.  *Id.* at 2.

TFC Gussoni said that after he stopped the car, he went to the passenger side of the car, enabling him "to observe more of the suspect(s) and the interior of the vehicle" and giving him "a tactical advantage for [his] safety."  *Id.*  He said that he noticed that (1) "[Martin] was staring straight ahead and was still grip[p]ing the steering wheel," while the passenger "look[ed] down at her clasped hands"; (2) Martin "tried not to make eye contact" with TFC Gussoni, Martin's "body seemed extremely tense, and carotid artery was pounding at the base of his neck"; and (3) Martin was wearing a Glock lanyard around his neck.  *Id.*  TFC Gussoni concluded that Martin's "actions were unlike the typical motorist stopped for a traffic violation and caused [TFC Gussoni] some concern."  *Id.*

13

Because of the loud traffic, TFC Gussoni asked Martin to
get out of the car.  TFC Gussoni said he had to ask Martin three
times to turn off the car, give TFC Gussoni the keys, and get
out, before Martin complied.  He noticed that, when Martin got
out of the car, he had a "blank stare on his face," his heart
"appeared [as] if it would jump out of his neck," he tried to
"put both hands in his front [pants] pockets," and his breathing
increased."  *Id.* at 3.  TFC Gussoni said that, based on these
observations, he asked to "pat [Martin] down for weapons," but
Martin "began to protest and question [the] request."  *Id.*  TFC
Gussoni "ordered Martin to turn-around" and frisked him.  *Id.*
TFC Gussoni asked Martin why he was so nervous and told Martin
he had patted him down because of Martin's acts and because he
was wearing a "Glock" lanyard.  *Id.*

TFC Gussoni said that Martin's story--that he was driving
Baker to her house in Gwynn Oak, Maryland, and he would
immediately return to Philadelphia--conflicted with Baker's--
that she lived in Pennsylvania and the two were visiting her
family in Baltimore for one week.  He said that Martin told him
he "did not know where he was traveling, only that he needed to
get off '695.'"  *Id.* at 3.  TFC Gussoni claimed that Baker's
"carotid artery [was] pounding" when he spoke with her, and her
hand trembled as she pulled her identification card from her
purse.  *Id.*

14

At this point, TFC Gussoni said it was 11:18 a.m. and he "believ[ed] criminal activity was afoot" because Martin's behavior was "inconsistent with normal interstate traffic and more indicative of criminal activity, and called for backup. *Id.* He also began to write a warning for Martin and check Martin's license and rental agreement, but had to wait for information from his barracks. *Id.* TFC Gussoni wrote that Sgt. Conner and TFC McCurdy arrived less than three minutes later, he saw Sgt. Conner frisk Martin and discover the loaded Glock, a dog sniffed the car and alerted, and a follow-up search of the vehicle revealed no contraband but powder laundry detergent covering the trunk, which is "a masking agent often used for the smuggling of" controlled substances. *Id.* at 3-4. TFC Gussoni noted in the application that he found a Florida concealed weapon license in Martin's wallet and that Martin "was uncooperative and would not answer questions regarding the firearm or his Florida permit." *Id.* at 4.

The charge application included the Etrace results, ATF's request for more time to investigate, and TFC Gussoni's request that the gun possession charges be *nolle prossed*. *Id.* at 4.

The application notes TFC Gussoni's conversation with the ATF special agent who told him that "due to lack of further investigative leads," Martin would not be prosecuted federally, and that the ATF "advised" TFC Gussoni that "the events

15

surrounding the gun seizure from Martin are indicative of firearms trafficking." *Id.*

TFC Gussoni noted that he consulted with the Cecil County Assistant State's Attorney who "agreed with the results of this investigation and . . . requested that [TFC Gussoni] apply for charges against Martin for" gun possession, transporting a handgun in a vehicle, and transporting a regulated firearm for unlawful sale or trafficking. *Id.* at 4-5.

TFC Gussoni "request[ed] that the . . . charges be filed against Martin on a criminal summons or warrant." *Id.* at 5.

On March 19, 2010, Martin was charged with the three District Court offenses and an arrest warrant was issued. ECF No. 14 Attach. 7 at 6-7.

D.   The Arrest and Detention

On March 22, 2010, TFC Gussoni "was finally able to make contact with Martin and advise him of the warrant." ECF No. 14 Attach. 21 at 11. The call was recorded. ECF No. 14 Attach. 26; ECF No. 7 Attach. 19. TFC Gussoni told Martin he had "an arrest warrant [TFC Gussoni] need[ed] to serve on [Martin]" regarding the October stop. ECF No. 14 Attach. 26. TFC Gussoni asked Martin to come to the MSP barracks that day to accept service. Martin said he could not come that day, and asked if he could "do this tomorrow." TFC Gussoni told him that was "fine" and gave him a telephone number to call to arrange to

16

meet him the next day.  TFC Gussoni explained that the charges had been *nolle prossed* for further investigation, and the state's attorney had brought them again.  *Id.*

Later on the 22nd, Martin met with his attorney, C. Thomas Brown, who "advised [him] not to turn [him]self in or take any other action until he had the chance to speak to law enforcement authorities about why an arrest warrant had been issued on *nolle prossed* charges."  *Id.* ¶27.

Also on March 22, the State's Attorney for Cecil County authorized Martin's extradition to Maryland from adjacent states.  ECF No. 14 Attach. 24.

On March 23, 2010, Brown called MSP barracks, trying to reach TFC Gussoni.[11]  He was told TFC Gussoni was not in, so he left a message "requesting a return call."  ECF No. 14 Attach. 23 ¶¶9-10.  TFC Gussoni did not receive the message.  ECF No. 7 Attach. 4 ¶33.  Martin did not turn himself in that day.  ECF No. 14 Attach. 3 ¶27.

On March 24, 2010, TFC Gussoni, recognizing that Martin had not turned himself in the previous day, notified the Pennsylvania State Police officers ("PSP") of the warrant.  ECF No. 7 Attach. 4 ¶33.  The PSP indicated that TFC Gussoni told them that Martin "was informed of the warrant the week of March

---

[11] Brown does not state whether he identified himself as Martin's attorney when he called or left the message.  ECF No. 14 Attach. 23 ¶10; ECF No. 14. Attach. 27 at 3.

15, 2010.  ECF No. 14 Attach. 27 at 3.  The PSP and U.S.
Marshals arrested Martin in his home.  *Id.*  Martin told them
there were two firearms in the house.  The officers searched his
home and found an assault rifle and handgun, loaded.  *Id.*  The
incident report indicates that TFC Gussoni told the Pennsylvania
authorities that Martin "was informed of the Warrant the week of
March 15, 2010."  *Id.*  TFC Gussoni had no contact with the PSP
after he notified them of the arrest warrant.  ECF No. 7 Attach.
4 ¶35.

On March 25, 2010, Martin was charged in Pennsylvania with
Arrest Prior to Requisition—being a fugitive from justice—, and
knowingly failing to relinquish a firearm; he was held on a
secured $500,000 bond on the fugitive charge and a secured
$10,000 bond on the failure to relinquish charge.  ECF No. 14
Attach. 28 at 3; ECF No. 14 Attach. 29 at 2.

Martin was detained in Pennsylvania until April 12, 2010,
when his bonds were unsecured; he was released on the condition
that he appear for his court dates in Maryland.  ECF No. 14
Attach. 28 at 3.  On April 22, 2010, the fugitive charge was
withdrawn.  ECF No. 14 Attach. 28 at 3.

On August 13, 2010, Martin was acquitted, after a bench
trial, of the Maryland charges.  ECF No. 14 Attach. 30.

On January 19, 2011, Martin was tried and found not guilty of the Pennsylvania failure to relinquish a firearm charge.   ECF No. 14 Attach. 29 at 5.

    E.   The Federal Suit

On April 5, 2011, Martin sued Sgt. Conner and TFC Gussoni in their individual and official capacities, asserting 13 causes of action, including deprivations of his civil rights.   ECF No. 1 ¶¶59-145.[12]   On July 5, 2011, the defendants moved to dismiss, or, in the alternative, for summary judgment.   ECF No. 7.   On August 26, 2011, Martin opposed the motion.   ECF No. 14.   On October 7, 2011, the defendants replied to Martin's opposition. ECF No. 17.

II.  Analysis

    A.   Standard of Review

Under Fed. R. Civ. P. 12(b)(6), an action may be dismissed for failure to state a claim upon which relief can be granted. If the movant presents, and the Court considers, matters outside

_____

[12] Martin's claims were: Counts 1, 3, 5, and 7 through 10, violations of 42 U.S.C. § 1983 (unconstitutional search and seizure (Counts 1 and 5), deprivation of equal protection (Count 3), unconstitutional seizure (Count 7), due process violation (Count 8), retaliatory prosecution (Count 9), conspiracy to deprive rights (Count 10)), Counts 2 and 6, violations of article 26 of the Maryland Declaration of Rights (unconsti-tutional search and seizure), Count 4, violation of article 24 of the Maryland Declaration of Rights (discriminatory classifi-cation), Count 11, malicious prosecution, Count 12, abuse of process, and Count 13, common law and Maryland Declaration of Rights conspiracy.   ECF No. 1 ¶¶59-145.   Counts 1 through 4 are against Sgt. Conner only.   *Id.* ¶¶59-84.

the pleadings, the Court must treat the motion as one for summary judgment. Fed. R. Civ. P. 12(d).

If the Court considers matters outside the pleadings on a Rule 12(b)(6) motion, it treats the motion as one for summary judgment under Rule 56. Fed. R. Civ. P. 12(d). "When a party is aware that material outside the pleadings is before the court, the party is on notice that a Rule 12(b)(6) motion may be treated as a motion for summary judgment." *Gay v. Wall*, 761 F.2d 175, 177 (4th Cir. 1985).

Under Rule 56(a), summary judgment "shall [be] grant[ed] . . . if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).[13] In considering the motion, "the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[14]  *Id.* at 248.

---

[13] Rule 56(a), which "carries forward the summary-judgment standard expressed in former subdivision (c)," changed "genuine 'issue' [to] genuine 'dispute,'" and restored the word "'shall' . . . to express the direction to grant summary judgment." Fed. R. Civ. P. 56 advisory committee's note.

[14] The parties may provide affidavits to support or defeat a motion for summary judgment. However, hearsay, conclusory, and

The Court must "view the evidence in the light most favorable
to . . . the nonmovant, and draw all reasonable inferences in
[its] favor," *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290
F.3d 639, 645 (4th Cir. 2002), but the Court must abide by the
"affirmative obligation of the trial judge to prevent factually
unsupported claims and defenses from proceeding to trial,"
*Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526
(4th Cir. 2003) (citation and internal quotation marks omitted).

Generally, "a district court must refuse summary judgment
wh[en] the nonmoving party has not had the opportunity to
discover information that is essential to [his] opposition."
*Nader v. Blair*, 549 F.3d 953, 961 (4th Cir. 2008) (internal
quotation marks and citation omitted).  In such a case, the
nonmoving party must comply with Fed. R. Civ. P. 56(d) and "set
out the reasons for discovery in an affidavit."  *Id.*  "The
purpose of the affidavit is to ensure that the nonmoving party
is invoking the protections of Rule 56[d] in good faith and to
afford the trial court the showing necessary to assess the
merits of a party's opposition."  *Harrods Ltd. v. Sixty Internet
Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002).

---

speculative statements that lack an evidentiary basis will not
support or defeat a motion for summary judgment.  *Greensboro
Prof'l Fire Fighters Ass'n, Local 3157 v. City of Greensboro*, 64
F.3d 962, 967 (4th Cir. 1995).

"[S]ufficient time for discovery is considered especially important when the relevant facts are exclusively in the control of the opposing party." *Harrods*, 302 F.3d at 246-47 (quotation marks omitted).

B.    Federal Qualified Immunity

Martin alleges seven counts of violations of his federal constitutional rights under 42 U.S.C. § 1983.  The defendants contend they are entitled to qualified immunity on them.  ECF No. 7 at 1.

Government officials performing discretionary functions are shielded from liability for civil damages under § 1983 when their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks and citation omitted).

Qualified immunity must be pled by the defendant official. *Id.* at 815.  Once the official raises a qualified immunity defense, the burden shifts to the plaintiff to show that the official's conduct violated the law. *Bryant v. Muth*, 994 F.2d 1082, 1086 (4th Cir. 1993).  The burden then shifts to the defendant to demonstrate that the right was not clearly established at the time of the incident. *Henry v. Purnell*, 501 F.3d 374, 378 (4th Cir. 2007).

Clearly established rights include specifically adjudicated rights as well as those manifestly included within more general applications of the core constitutional principles involved. *Wilson v. Layne*, 141 F.3d 111, 114 (4th Cir. 1998). There are three ways in which law becomes clearly established in Maryland: (1) an authoritative decision by the United States Supreme Court; (2) an authoritative decision by the Fourth Circuit Court of Appeals; or (3) an authoritative decision by the Court of Appeals of Maryland. *Id.* Decisions from other circuits or states are not authoritative for qualified immunity analysis. *Id.*

A constitutional right is clearly established "when its contours are sufficiently clear that a reasonable official would understand that what he is doing violates that right."[15] The defendants bear the burden of proof on whether the constitutional right was clearly established at the time of the alleged violation.[16]

The Fourth Circuit has emphasized "the importance of resolving the question of qualified immunity at the summary

---

[15] *Franklin*, 2000 WL 2632298 at *12 *(citing Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292, 313 (4th Cir. 2006)). This determination is an objective one. *Id.* (*citing Wilson v. Kittoe*, 337 F.3d 392, 402 (4th Cir. 2003)).

[16] *Henry v. Purnell*, 501 F.3d 374, 378 (4th Cir. 2007) (*citing Wilson,* 337 F.3d at 397).

judgment stage rather than at trial." *Wilson v. Kittoe*, 337 F.3d 392, 397 (4th Cir. 2003). *Wilson* recognizes, however, that "the qualified immunity question can . . . at times require factual determinations respecting disputed aspects of [a defendant's] conduct." *Id.* "The importance of summary judgment in qualified immunity cases does not mean . . . that summary judgment doctrine is to be skewed from its ordinary operation to give substantive favor to the defense, important as may be its early establishment." *Id.*

Qualified immunity analysis generally proceeds in two steps. The Court must decide whether the facts that the plaintiff has alleged or shown make out a violation of a constitutional right. *Pearson v. Callahan*, 129 S. Ct. 808, 815 (2009). The Court must also decide whether the right at issue was "clearly established" at the time of the alleged misconduct. *Id.* at 818 (the district courts may exercise their sound discretion in deciding which prong of the qualified immunity analysis should be addressed first).

C.   Maryland Statutory Immunity

The defendants seek summary judgment on the state common law and constitutional claims under Section Five of the Maryland Code Annotated, Courts and Judicial Proceedings Article. Section 5-522(b) grants immunity to state officials for acts committed without malice or gross negligence and within the

24

scope of the official's public duty.[17]   MD. CODE ANN., CTS. & JUD.

PROC. § 5-522(b).  The defendants are state officials.  MD. CODE

ANN., STATE GOV'T § 101(a)(6); *Ritchie v. Donnelly*, 324 Md. 344,

597 A.2d 432 (1991); *Rucker v. Harford County*, 316 Md. 275, 558

A.2d 399 (1989).  "Unlike qualified immunity, . . . the question

of [statutory] immunity . . . is a subjective one . . . [and is

usually reserved] for the trier of fact."  *Newell v. Runnels*,

407 Md. 578, 636, 967 A.2d 729, 763 (2009).

    D.   Claims Against the Defendants in their Official
        Capacities

The defendants contend that the claims against them in

their official capacities should be dismissed because § 1983

authorizes suit against state actors in their official capacity

only when the actors are final policy makers.  ECF No. 7 at 53

(*citing City of St. Louis v. Praprotnik*, 485 U.S. 112, 125 n.2

---

[17] "Both malice and gross negligence are amorphous concepts."
*Newell v. Runnels*, 407 Md. 578, 636, 967 A.2d 729, 763 (2009).
Malice is "behavior characterized by evil or wrongful motive,
intent to injure, knowing and deliberate wrongdoing, ill-will or
fraud." *Id*. (*citing Barbre v. Pope*, 402 Md. 157, 182, 935 A.2d
699, 714 (2007)) (internal citations omitted). Malice is often
"inferred from acts and circumstantial evidence. [It is] seldom
admitted and need not be proven by direct evidence." *Id*. at 407
Md. at 637, 967 A.2d at 763 (*citing Henderson v. Md. Nat'l Bank*,
278 Md. 514, 520, 336 A.2d 1, 5 (1976)) (internal citations
omitted). Gross negligence is "an intentional failure to perform
a manifest duty in reckless disregard of the consequences as
affecting the life or property of another. . ." *Id*. (*citing
Taylor v. Harford County Dep't Soc. Servs.*, 384 Md. 213, 229, 862
A.2d 1020, 1035 (2004)) (internal citations omitted).

(1988)).[18]  Martin does not challenge this argument.  *See* ECF No. 14.  The complaint sues Sgt. Conner and TFC Gussoni in their personal and official capacities, but no count specifies to which capacity it relates.  *See* ECF No. 1.  Accordingly, to the extent the claims are against the defendants in their official capacities, they will be dismissed.

    E.    Counts Five and Six: The October 12, 2009 Stop

Counts five and six allege that on October 12, 2009, TFC Gussoni and Sgt. Conner violated Martin's Fourth Amendment rights by unlawfully stopping and frisking him, and unlawfully searching his car.  ECF No. 1 ¶¶85-97.

The Fourth Amendment[19] prohibits unreasonable searches and seizures.  *Terry v. Ohio*, 392 U.S. 1, 8 (1968).  Fourth Amendment reasonableness inquiries are fact-intensive.  *Franklin v. Montgomery County*, DKC-05-0489, 2006 WL 2632298, *13 (D. Md.

---

[18] In *Praprotnik*, the Supreme Court noted that state actors can be sued for violations of § 1983 in their official capacity only when they are final policy makers and the allegedly wrongful act was taken pursuant to official policy.  485 U.S. at 121-22.  The Court stated that it was "aware of nothing in § 1983 . . . that would support the notion that unauthorized acts of subordinate employees are official policies.  *Id*. at 125 n.2.

[19]    The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. CONST. AMEND. IV.

Sept 13, 2006).  A law enforcement officer may stop an individual when the officer has reasonable suspicion to believe "criminal activity may be afoot."  *Terry*, 392 U.S. at 30.  The officer may also check a person for weapons if the officer has reasonable suspicion that "the persons with whom he is dealing may be armed and presently dangerous."  *Id.*

An officer's subjective motive for conducting a traffic stop is irrelevant if, objectively, he had reasonable suspicion to make the stop.  *Whren v. United States*, 517 U.S. 806, 812 (1996); *Ohio v. Robinette*, 519 U.S. 33, 39 (1996); *United States v. Digiovanni*, 650 F.3d 498, 506 (4th Cir. 2011).  If he lacked reasonable suspicion, the stop and any resulting search violate the Fourth Amendment.  *See Whren*, 517 U.S. at 811-12.  An officer may lawfully make a traffic stop if he observes a violation of traffic laws.  *Whren*, 517 U.S. at 817-18.

1.   Qualified Immunity

a.   Was the Right Clearly Established?

The right not to be subjected to a traffic stop without reasonable suspicion was clearly established in 2009.  *See Whren*, 517 U.S. at 811-12.

b.   Did TFC Gussoni & Sgt. Conner Violate Martin's Right?

TFC Gussoni's affidavit states that (1) his laser "indicated that [Martin's car was] traveling at 75 [miles per

27

hour]," 10 miles per hour above the speed limit, and (2) Martin

"quickly exited off of I-95 at exit 100 . . . . caus[ing]

another vehicle to nearly run off the roadway and cause an

accident." ECF No. 7 Attach. 4 ¶¶3-6. Martin's affidavit

states that he was safely driving within the speed limit when

TFC Gussoni stopped him. ECF No. 13 Attach. 3 ¶¶4-5. If TFC

Gussoni reasonably believed that Martin was speeding or

violating traffic laws when TFC Gussoni stopped him, the stop

was valid. If TFC Gussoni lacked such a reasonable belief, the

stop and subsequent searches violated Martin's Fourth Amendment

right to be secure in his person. *See Whren*, 517 U.S. at 811-

12. Whether TFC Gussoni reasonably believed that Martin was

obeying the traffic laws is a disputed, material fact. Summary

judgment is not appropriate on Count five of the complaint.

> 2.   Statutory Immunity

Article 26 of the Maryland Declaration of Rights "pro-

hibit[s] unreasonable searches and seizures under the same

circumstances as does the Fourth Amendment." *Agurs v. State*,

415 Md. 62, 103, 998 A.2d 868, 892 (2010). Whether the officers

are entitled to statutory immunity requires a factual determin-

ation of their subjective intent. *Newell*, 407 Md. at 636, 967

A.2d at 763. As noted above, whether Martin was violating

traffic laws when TFC Gussoni stopped him is disputed. Viewing

the evidence in the light most favorable to Martin, the non-

movant, a reasonable juror could accept Martin's account of the stop and find that TFC Gussoni knew or should have known that Martin was obeying the traffic laws when TFC Gussoni stopped him. *See* ECF No. 14 Attach. 3 ¶5.

Making a stop when an officer knows or should know that he does not have reason for the stop is knowing wrongdoing or gross negligence. *See Lee v. Cline*, 384 Md. 245, 270, 863 A.2d 297, 312 (2004) (a jury could infer malice from officer's prolonging of auto stop only because the plaintiff did not consent to search of car, order of a canine sniff "when there was utterly no evidence in the record justifying such a 'search' of the vehicle," and reference to plaintiff as an uncooperative suspect). Accordingly, summary judgment is also inappropriate on Count six of the complaint.

F.    Counts One through Four: The December 9, 2009 Stop

The first four counts allege that on December 9, 2009, Sgt. Conner unlawfully stopped Martin on the basis of his race and without probable cause or reasonable suspicion. ECF No. 1 ¶¶59-84.

29

1. Fourth Amendment/Article 26 Claims

    a. Qualified Immunity

        i. Was the Right Clearly Established?

The right not to be subjected to a traffic stop without reasonable suspicion was clearly established in 2009. *See Whren*, 517 U.S. at 811-12.

        ii. Did Sgt. Conner Violate Martin's Rights?

Sgt. Conner's affidavit states that (1) his laser was working on the morning of December 9, 2009, and would have shut down if it was not working, (2) at 9:55 a.m. his laser indicated that a black Kia Spectra with Florida license plates was driving 73 miles per hour in the 65 mile per hour speed zone, (3) the Kia slowed to about 45 miles per hour as it passed, and (4) at the time he decided to stop the car, he "did not know the race or age of the driver." ECF No. 17 Attach. 1 ¶¶16-18.

Martin's affidavit states that "from the time my car approached [Sgt. Conner's] car in the median until the time [Sgt. Conner] stopped me, I was traveling at speeds of 60 mph or less." ECF No. 14 Attach. 3 ¶17. Martin's Smart Black Box recording of the stop measured his speed at 55 to 66 miles per hour during the eight minutes before the stop. ECF No. 14 Attach. 12.

If Sgt. Conner reasonably believed that Martin was speeding or violating traffic laws when Sgt. Conner stopped him, the stop was reasonable.[20]  If Martin was complying with the traffic laws, and Martin lacked a reasonable belief otherwise, the stop and subsequent search violated Martin's Fourth Amendment right to be secure in his person. *See Whren*, 517 U.S. at 811-12.  Whether Sgt. Conner reasonably believed that Martin was obeying the traffic laws is a disputed, material fact.  Summary judgment is not appropriate on Count one of the complaint.

b.   Statutory Immunity

For the reasons discussed in relation to Count six of the complaint, the disputed facts render summary judgment inappropriate on Sgt. Conner's statutory immunity defense and on Count two of the complaint.  *See* part II.D.2, *supra*.

2.   Equal Protection/Article 24 Claims

The Fourteenth Amendment demands that a state afford "the equal protection of the laws" to all persons within its jurisdiction.  U.S. CONST. AMEND. XIV.

---

[20] Because the Court asks whether Sgt. Conner and TFC Gussoni *reasonably* believed that Martin was violating the traffic laws, not whether he was actually violating them, the conflicts between the affidavits (and the black box recording) are not necessarily inconsistent.  If the officers' lasers, the black box, or Martin's odometer, miscalculated Martin's speed, or if the laser was measuring the speed of a car near Martin's and the officers reasonably believed it was reading the speed of Martin's car, the officers would be entitled to statutory immunity.

a.   Federal Equal Protection

i.   Was the Right Clearly Established?

The Fourteenth Amendment right not to be stopped on the basis of race was clearly established in 2009.  *Md. State Conf. of NAACP Branches v. Md. State Police*, 454 F. Supp. 2d 339, 347 (D. Md. 2006) (*citing Whren*, 517 U.S. at 813).

ii.   Did the Defendants Violate that Right?

"[E]ncounters with officers may violate the Equal Protection Clause when initiated . . . based on racial considerations." *United States v. Frazier*, 394 F.3d 612, 617 (8th Cir. 2005); *see also Marshall v. Columbia Lea Reg'l Hosp.*, 345 F.3d 1157, 1168 (10th Cir. 2003).  To avoid summary judgment, the burden is on the § 1983 plaintiff "challenging alleged racial discrimination in traffic stops and arrests" to "present evidence from which a jury could reasonably infer that the law enforcement officials involved were motivated by a discriminatory purpose and their actions had a discriminatory effect." *Marshall*, 345 F.3d at 1168.

In *Marshall*, on which Martin relies, the defendant officer moved for summary judgment on the plaintiff's claim that the officer stopped him on the basis of his race.  *Id.*  In response, Marshall presented evidence, "disputed, to be sure," that: (1) he did not commit the traffic infraction that was the alleged basis of the stop; (2) the officer knew Marshall's race before

32

making the stop; (3) the officer "made repeated accusations that
Mr. Marshall was on crack with no apparent basis"; (4) the
officer noted Marshall's race and gender in the "gender" box of
the incident report; and (5) the officer's "account of the
events changed dramatically between the date of the incident and
that date of his affidavit" in Marshall's suit. *Id.* at 1170.
The officer offered "no nondiscriminatory explanation" for his
actions except to contest that Marshall committed the traffic
violation. *Id.*

In light of that showing, the Tenth Circuit concluded that
it was "a close question" whether Marshall had presented enough
evidence to survive summary judgment, and remanded to the
district court for further analysis. *Id.* at 1171. It added
that, if accurate, the officer's "extensive alleged [history of]
misconduct" (which had led to his termination from another
police department) "might raise an inference of racial discrim-
ination . . . or provide evidence that similarly situated
individuals of a different race received different treatment."
*Id.*

Martin has identified evidence--much of which is disputed--
that: (1) he was not speeding when Sgt. Conner saw him on
Interstate 95;[21] (2) Sgt. Conner had an unobstructed view of

---

[21] ECF No. 14 Attach. 3 ¶17.

Martin as Martin drove by the officer's post on Interstate 95;[22]

(3) he did not smell marijuana in the rental car when Sgt.

---

[22] Martin argues that "the evidence establishes that Defendant Sgt. Conner had an opportunity to observe Mr. Martin's race before pulling over" because the black box video shows Martin in the center lane of Interstate 95, without any cars between him and Sgt. Conner, as he passes Sgt. Conner's parked car.  ECF No. 14 at 27.  Evidence that an officer looked directly at an individual as both were stopped, at a close range, can support an inference that the officer "was ascertaining [the individual's] race." *Marshall*, 345 F.3d at 1169.  That scenario does not necessarily lead to the conclusion that Sgt. Conner was able to determine Martin's race as Martin passed by at 60 miles per hour or faster, but a reasonable jury could conclude that Sgt. Conner had the chance to see that Martin was African-American, and that is enough at this stage.

Martin further asserts that, because Sgt. Conner pulled Martin over about two miles past the point where Martin passed Sgt. Conner, Sgt. Conner "did not decide to pursue and stop Mr. Martin until he had a chance to observe Mr. Martin's race." ECF No. 14 at 27.  That Sgt. Conner did not activate his emergency lights or begin to follow Martin until Martin had passed him (the moment at which Sgt. Conner allegedly had the opportunity to determine Martin's race), does not, alone, create an inference that he decided to make the stop based on Martin's race.  In *Marshall*, the evidence showed that the defendant officer saw Marshall fail to stop at a stop sign, then, several blocks after the traffic violation, pulled next to Marshall at a stop, looked at Marshall's face, and moments later activated his emergency lights.  *Id.*  The sequence of events--that the officer, who was following Marshall before the violation, observed the violation, continued to follow Marshall *without* signaling him to pull over, determined that Marshall was African-American, *then* pulled him over, would permit a jury to reasonably infer that Marshall's race "played a part in the decision to initiate the stop." *Id.*  Here, by contrast, Martin has not shown that Sgt. Conner observed the alleged traffic violation before he had the opportunity to see that Martin was African-American.  Thus, there is no evidence that, before realizing that Martin is African-American, Sgt. Conner had reasonable suspicion to stop him but chose not to, as there was in *Marshall*.

Conner stopped him;[23] (4) although Sgt. Conner claimed that he stopped Martin for speeding, Sgt. Conner did not give Martin a speeding ticket; (5) although Sgt. Conner claimed to smell marijuana in the car, he did not use the K-9 unit called to the scene;[24] (6) Sgt. Conner supervised TFC Gussoni's investigation into reopening the gun charges;[25] (7) that investigation began the day after MSP received Martin's PIA request for records related to the December 9 stop;[26] and (8) Sgt. Conner "has a history of stopping and searching a disproportionate number of non-white motorists."[27]

---

[23] ECF No. 14 Attach. 3 ¶20.

[24] ECF No. 14 Attach. 3 ¶¶21-22.

[25] ECF No. 14 Attach. 21 at 10.

[26] *Compare* ECF No. 14 Attach. 19 (Feb. 18, 2010 PIA request for documents related to December 9, 2009 stop, received on March 1, 2010) *and* ECF No. 14 Attach. 20 (Mar. 3, 2010 PIA request for documents related to October 12, 2009 stop, received on March 5, 2010) *with* ECF No. 14 Attach. 7 at 4 (TFC Gussoni's affidavit in support of application for statement of charges, stating that on March 2, 2010, he contacted ATF to determine the status of the investigation of Martin's gun, and on March 4, 2010 he told the Cecil County State's Attorney's Office that he believed Martin was transporting the gun for unlawful sale).
Martin contends that the timing of the investigation should be interpreted as an "effort to deter Mr. Martin from investigating the traffic stop," and that that interpretation "raises an inference of racial discrimination" because Sgt. Conner "hoped [reviving the gun charges] would discourage Mr. Martin from seeking to discover . . . that profiling had occurred." ECF No. 14 at 27. Martin has identified no evidence or authority supporting this inference.

[27] ECF No. 14 at 27 (*citing* ECF No. 14 Attach. 18 at 4-5).

In response, Sgt. Conner contends that "[b]ecause the Laser was the basis of the stop, [and the laser is 'a device that obviously does not allow for race to be a factor in measuring speed,'] there can be no discriminatory intent on the part of Sgt. Conner."  ECF No. 17 at 18.  Sgt. Conner identifies no evidence that MSP officers are required to stop every car for which the laser indicates an unlawful speed, or of the criteria for selecting cars for which officers take laser readings.  *See id.*  Accordingly, based on the current evidence, a jury could reasonably conclude that human factors affect the decision to stop a car, before or after a laser indicates that the car is speeding.

The evidence in *Marshall* was "close"; the evidence here is closer.  *See Marshall*, 345 F.3d at 1170.  Martin has not offered evidence that Sgt. Conner explicitly accused him of criminal activity based on racial stereotypes, blatantly checked Martin's race before deciding to pull him over, changed his story of the events leading to the stop, or had an "extensive" disciplinary record that included termination for misconduct.  *Id.* at 1169-71.  However, Martin need not provide overwhelming evidence--he must only show that a reasonable jury could conclude that a violation occurred.  *See Anderson*, 477 U.S. at 248.  Viewing the evidence in the light most favorable to Martin, a reasonable jury could conclude that Sgt. Conner saw that Martin was

African-American, then decided to pull him over.   Summary
judgment is inappropriate.

> b.   Article 24

Article 24 of the Maryland Declaration of rights applies
"in like manner and to the same extent as the Fourteenth
Amendment of the Federal Constitution, so that decisions of the
Supreme Court on the Fourteenth Amendment are practically direct
authorities."   *Frey v. Comptroller of Treasury*, 422 Md. 111,
176, 29 A.3d 475, 513 (2011).   Malice includes "knowing . . .
wrongdoing."   *Newell v. Runnels*, 407 Md. 578, 636, 967 A.2d 729,
763 (2009).   As a jury could infer that Sgt. Conner stopped
Martin on the basis of his race, *see supra*, and racial profiling
is a well-settled violation of the Equal Protection guarantee,
*see Whren*, 517 U.S. at 813, a jury could infer that Sgt. Conner
knew he was violating Martin's rights when he stopped Martin.
Accordingly, a jury could conclude that Sgt. Conner acted with
malice.   The disputed facts render statutory immunity and
summary judgment is inappropriate on Count four.

Summary judgment will be denied on the Federal and Article
24 Equal Protection counts.

G.    Counts Seven through Twelve: The Gun Charges, Warrant, and Arrest

1.    Prosecution without Probable Cause

Count seven alleges that Sgt. Conner and TFC Gussoni violated Martin's Fourth Amendment right to be free from unreasonable seizures by securing a charge unsupported by probable cause.  ECF No. 1 ¶¶101-06.  Count 11 alleges that the officers violated Maryland common law by instigating a malicious prosecution against him.  ECF No. 1 ¶¶129-34.

To prevail on a Fourth Amendment claim for unreasonable seizure based on a charge unsupported by probable cause under § 1983,

> a plaintiff must show that: (1) the defendant initi-
> ated or maintained a criminal proceeding; (2) the
> criminal proceeding terminated in the plaintiff's
> favor; (3) the proceeding was not supported by
> probable cause; and (4) the plaintiff suffered
> deprivation of liberty consistent with the concept of
> seizure as a consequence of a legal proceeding.

(4th Cir. 2009) (Stamp, J., concurring) (*citing Lambert v. Williams*, 223 F.3d 257, 260-62 (4th Cir. 2000)).[28]

In Maryland, to prevail on a common law malicious prosecution claim, the plaintiff must allege:

> 1) a criminal proceeding instituted or continued by
> the defendant[s] against the plaintiff; 2) without
> probable cause; 3) with malice, or with a motive other
> than to bring the offender to justice; and 4)

---

[28] *See also Walker v. Owen*, No. RWT-09-2380, 2011 WL 3273204, *3 (D. Md. Jul. 29, 2011) (same).

38

termination of the proceedings in favor of the plaintiff.

*Heron v. Strader*, 361 Md. 258, 264, 761 A.2d 56, 60 (2000).

The defendants can defeat both claims if they show that there was probable cause to institute the charges.[29]

a.   Qualified Immunity

i.   Was the Right Clearly Established?

The parties agree that "a Fourth Amendment right not to be seized based on a criminal offense unsupported by probable cause was clearly established . . . when [the] Defendants sought to charge Mr. Martin with gun trafficking." ECF No. 14 at 36; ECF No. 17 at 6, 20-22.

ii.   Were Martin's Constitutional Rights Violated?

Martin contends that "the allegations in the complaint, supported by the pre-discovery evidence, make out a cognizable claim for" prosecution without probable cause. ECF No. 14 at 36.

Martin recognizes that he must show "not only that the gun trafficking charge was unsupported by probable cause to defeat Defendants' claim of qualified immunity, but also that Defendants knew or reasonably should have known that the charge was unsupported by probable cause." *Id.* He contends that he

---

[29] *Snider*, 584 F.3d at 202; *Heron*, 361 Md. at 264, 761 A.2d at 60.

has satisfied this burden because (1) the officers obtained the
charge "by providing false, misleading and/or incomplete
information to the Cecil County commissioner who approved the
charge," and without that information, and with "readily
available exculpatory information, . . . probable cause would
not have existed"; and (2) even if the officers provided true,
complete, and non-misleading information, "a reasonably well-
trained officer would have known that the information actually
furnished was insufficient to establish probable cause."  ECF
No. 14 at 37-38.

The officers contend that the evidence shows that there was
probable cause to institute the charges, they did not provide
"misleading" information to the prosecutors, and Martin's
Philadelphia detention was not a foreseeable consequence of
opening the charges.  ECF No. 7 Attach. 2 at 18; ECF No. 17 at
20-21.

I.   Misrepresentations or Omissions

"Reasonable law enforcement officers are not required to
exhaust every potentially exculpatory lead or resolve every
doubt about a suspect's guilt before probable cause is
established."  *Wadkins v. Arnold*, 214 F.3d 535, 541 (4th Cir.
2000).  On the other hand, "an officer may not disregard readily

available exculpatory evidence of which he is aware." *Id.*[30]   An

officer's conference with an assistant state's attorney before

seeking criminal charges "weighs heavily toward a finding that

[the officer] is immune," even if he in fact lacked probable

cause to charge the suspect with a crime, unless the officer

---

[30] Martin relies on *Sevigny v. Dicksey*, 846 F.2d 953 (4th Cir. 1988), *Clipper v. Takoma Park*, 876 F.2d 17 (4th Cir. 1989), and *Taylor v. Farmer*, 13 F.3d 117 (4th Cir. 1993) to assert that officers have a duty to discover "readily available exculpatory information" that is not called to their attention.   ECF No. 14 at 37.   In *Clipper* and *Taylor*, however, witnesses called the defendant officers' attention to exculpatory evidence or contradictions in the evidence that undermined the probable cause determination.   *Clipper*, 876 F.2d at 19; *Taylor*, 13 F.3d at 120.   Accordingly, those cases do not show a duty to seek exculpatory evidence of which the officer is not aware.   *Cf. Wadkins*, 214 F.3d at 541 ("[A]n officer may not disregard readily available exculpatory evidence of which he is aware.").

*Sevigny* considered whether an officer had probable cause to arrest a woman without a warrant, when he planned to charge her with crimes based on two "mutually inconsistent factual theories: that [the plaintiff] herself had run [her] car into the building; that her child had done so.   Both obviously could not have been proven."   846 F.2d at 957.   In light of that clear inconsistency, the Fourth Circuit found that the officer should have at least made "rudimentary inquiries of neighbors then on the scene."   *Id.*   Accordingly, the officer must have been aware of the neighbor-witnesses *and* aware that he did not have enough information to determine what probably happened, creating a duty to make at least "rudimentary inquiries."   *See id.*   *Sevigny* does not create a general duty for an officer who has already pursued "rudimentary" investigation--or more--, and satisfied himself that he has probable cause to believe the suspect has committed one crime--rather than a general suspicion that the suspect committed one of two crimes.

"provided misleading information to the [state's] attorney."[31]
*Id.* at 541-42.

To succeed on a Fourth Amendment claim that the officer
obtained a charge based on misleading or incomplete information,
the plaintiff must

> prove that [the officer] deliberately or with a
> reckless disregard for the truth made material false
> statements . . . or omitted . . . material facts[32] with
> the intent to make, or with reckless disregard of
> whether they thereby made, the affidavit misleading.

*Miller v. Prince George's Cnty.*, 475 F.3d 621, 627 (4th Cir.
2007) (internal quotation marks and citation omitted).  An
officer acts with reckless disregard for the truth if he
includes statements "with a high degree of awareness of [their]
probable falsity," meaning that he "entertained serious doubts
as to the truth of his statements or had obvious reasons to
doubt the accuracy of the information he reported."  *Id.*
(internal quotation marks and citations omitted).  An officer
omits material facts with reckless disregard when he "fail[s] to

---

[31] The Fourth Circuit has endorsed the Ninth Circuit's statement
that "[i]t would be plainly unreasonable to rule that the
arresting officers must take issue with the considered judgment
of an assistant United States Attorney and the federal
magistrate [judge]."  *Wadkins*, 214 F.3d at 543 (*quoting
Armstrong v. United States*, 757 F.2d 971, 981 (9th Cir. 1985)).

[32] A fact is material if it affects the probable cause
determination.  A misrepresentation is material if, without it,
there would be no probable cause, and an omission is material if
including the omitted fact would defeat probable cause.  *Miller*,
475 F.3d at 628.

[include] facts he kn[ows] would negate probable cause." *Id.* (internal quotation marks and citations omitted).

Martin contends that TFC Gussoni misrepresented that he had probable cause to stop and frisk Martin on October 12, 2009,[33] in the application to reopen the gun charges. ECF No. 14 at 38. Even if the unproven statements were misrepresentations, they were not necessary to a finding of probable cause, as they related to the whether the stop, not the gun trafficking charge, was supported by probable cause.[34] *See Savage v. Mayor & City Council of Salisbury*, No. 2010 WL 3038953, *5 (D. Md. Jul. 30, 2010) (distinguishing between finding of probable cause to stop and probable cause to pursue charges for possession of contraband discovered incident to the stop).

Next, Martin contends that TFC Gussoni omitted several pieces of information that were "readily accessible": that Martin bought the gun legally from a licensed dealer more than

---

[33] Specifically, Martin contends that TFC Gussoni's statements that Martin was "driving evasively and committing traffic violations" and that he "and his girlfriend gave conflicting accounts of the length of their planned trip to Baltimore" were false. ECF No. 14 at 38.

[34] Though a finding that the stop or subsequent frisk was not supported by probable cause might have led to suppression of the gun, it does not relate to Martin's actual innocence, and the test for the statement of probable cause appears to be concerned with probable cause to believe Martin *committed* the offense, not his likelihood of conviction. *See Wadkins*, 214 F.3d at 541 ("Probable cause does not require an officer to be certain that subsequent prosecution of the arrestee will be successful." (internal quotation marks and citation omitted)).

three years before Sgt. Conner discovered it, had a valid
Pennsylvania permit to carry it,[35] and had no evident connections
with Saines, the suspected straw purchaser.  ECF No. 14 at 38-
39.  Though an officer may not ignore potentially "exculpatory
evidence of which he is aware," he does not have a duty to
discover evidence of which he is not aware.  *See Wadkins*, 214
F.3d at 541.  He need not "exhaust every potentially exculpatory
lead or resolve every doubt about a suspect's guilt before
probable cause is established."  *Id.*

Further, TFC Gussoni noted in his application that Martin
had a Florida concealed firearm license, and that, "due to lack
of further investigative leads," the federal government had
decided not to prosecute Martin.  ECF No. 14 Attach. 7 at 4.
Accordingly, TFC Gussoni provided all the potentially
exculpatory evidence of which he was aware in the application
for charges, including that Martin was entitled to carry a
concealed firearm in some states and that the federal government
had chosen not to prosecute Martin for gun trafficking.

## II.  Probable Cause

Martin contends that "[o]f the various factors that . . .
TFC Gussoni cites in his affidavit [explaining his reasons for

---

[35] Having a valid Pennsylvania permit does not allow Martin to
carry his gun in Maryland, MD. CODE, CRIM. L. § 4-203, but it
might undermine the trafficking charge, *see* MD. CODE, PUB. SAFETY §
5-140.

requesting the trafficking charge], none shows either indepen-
dently or in combination anything more than that Mr. Martin
unlawfully possessed a gun outside of the state in which he was
licensed to carry it."  ECF No. 14 at 40-41.[36]

It is indisputable that, when he applied to reopen charges,
TFC Gussoni knew that: (1) Martin was traveling on I-95;[37] (2)
Sgt. Conner discovered a gun on Martin during the October stop;
(3) the officers found laundry detergent, a drug masking agent,
covering the trunk of the car; (4) Martin had a Florida license
to carry a concealed weapon but could or would not tell the
officers where else he was permitted to carry it; (5) the ATF
believed that: (a) Saines, of New Castle, Pennsylvania,
originally purchased the gun, (b) Saines "ha[d] been under
investigation for straw purchases" of guns, and (c) of four guns
sold to Saines, three had been seized from unregistered owners
after use in violent crimes; and (6) the United States had
considered instituting federal charges against Martin, but after
several months of investigation, decided against it "due to lack

---

[36] Martin thus concedes that TFC Gussoni had probable cause to
reopen the gun possession charges, and contests only the
trafficking charge.  *See id*.

[37] A "major thoroughfare for narcotics trafficking."  *United
States v. Newland*, 246 F. App'x 180, 188 (4th Cir. 2007) (taking
judicial notice of the "fact [that I-95 is] a major thoroughfare
for narcotics trafficking" and noting that "travel on I-95 is a
valid factor in a reasonable suspicion analysis").

of further investigative leads." ECF No. 14 Attach. 7 at 4; ECF
No. 14 at 41-42; ECF No. 7 Attach. 4 ¶26.

In addition, the recording of the stop shows Martin telling
TFC Gussoni that he planned to drop Baker off at her home in
Baltimore and immediately return to Philadelphia, and shows TFC
Gussoni interpreting Baker's explanation of the couple's plan as
involving both of them staying at her family's home in Baltimore
for one week. ECF No. 14 Attach. 5. (TFC Gussoni can be heard
asking whether "you guys" planned to stay in Baltimore, "for the
week?" and mentioning "your [Baker's] family.").

Probable cause "only requires enough evidence to warrant a
man of reasonable caution in the belief that an offense has been
. . . committed." *Wilkes v. Young*, 28 F.3d 1362, 1365 (4th Cir.
1994). "[A] defendant's innocent explanations for his odd
behavior cannot eliminate the suspicious facts from the probable
cause calculus. . . . Furthermore, the fact that any one fact .
. . would not alone support a finding of probable cause does not
mean that probable cause was absent." *Sennett v. United States*,
No. 11-1421, 2012 WL 256065, *5 (4th Cir. Jan. 30, 2012). A
determination of probable cause requires consideration of "the
totality of the relevant circumstances." *United States v.
Allen*, 631 F.3d 164, 172 (4th Cir. 2011) (internal quotation
marks and citations omitted). The assessment requires a
decisionmaker to "make a practical, commonsense decision

46

whether, given all the circumstances . . . there is a fair
probability that" the suspect has committed a crime.  *Id.*
(internal quotation marks and citations omitted).

Here, TFC Gussoni and Sgt. Conner had probable cause to
believe Martin had committed the charged crimes.  In Maryland, a
person commits the crime of transporting a regulated firearm for
unlawful sale when he "[1] transport[s] a regulated firearm into
the State [2] for the purpose of unlawfully selling or traffick-
ing" it.  MD. CODE, PUB. SAFETY, § 5-140.  Handguns are regulated
firearms.  *Id.*  The charge application demonstrates ample
undisputed probable cause supporting the first element: Martin
entered Maryland from Pennsylvania carrying a handgun.  ECF No.
14 Attach. 7 at 3; ECF No. 14 at 40-41.

Probable cause for the second prong--that Martin intended
to unlawfully sell the gun--can be inferred from the surrounding
facts: he did not want to tell the officers where he was allowed
to carry the gun, he and his traveling companion presented
conflicting accounts of where they were going, the gun had
direct ties to a suspected straw purchaser, and the ATF
investigated Martin's ties to gun trafficking for several months
before deciding there were not enough leads to prosecute him
federally.  *Cf. Payne v. City of Laurel*, No. RDB-07-0583, 2009
WL 1871258, *9 (D. Md. June 29, 2009) (probable cause to believe
arrestee had requisite intent to impersonate a police officer

could be inferred from facts in affidavit when arrestee, a
civilian, possessed and showed others police badge with no
identification number).  Accordingly, the officers had probable
cause to apply for the charges.[38]

### III. Conclusion

None of the disputed facts is material to Count seven.
Viewing the undisputed facts in the light most favorable to
Martin, the officers are entitled to judgment as a matter of
law.  No interpretation of the facts supports a claim that the
officers made material misrepresentations or omissions in
seeking to reopen charges.  Based on the evidence the officers
provided, there was probable cause for the charges.  According-

---

[38] Even if the officers lacked probable cause, in order to
overcome qualified immunity, the supporting facts must be "so
lacking in indicia of probable cause as to render official
belief in its existence unreasonable." *Gomez v. Atkins*, 296
F.3d 253, 262 (4th Cir. 2002) (*quoting Malley v. Briggs*, 475
U.S. 335, 344-45 (1986)).  That standard is not demanding. *See,
e.g.*, *Wadkins*, 214 F.3d at 540-41 (officer reasonably believed
arrestee-husband had intent to defraud based on wife's
misrepresentation to bank that a check had been properly
endorsed when it obviously had not, couple's writing of
"substantial number of bad checks" on account when they knew
there was a hold on the account and bank notified them that
depositing check had been returned as improperly endorsed, and
arrestee-husband signed his name twice on check, once for
himself, and once for financing agency though he was not
associated with agency).  The facts here permit an officer to
reasonably infer intent to traffic from: Martin's secret
possession of a gun that had ties to a suspected straw
purchaser, the inconsistent statements by Martin and Baker about
their destination, and the ATF's extended investigation before
deciding the leads were insufficient for federal standards.

ly, summary judgment will be granted to the defendants on Count seven.

### b.   Count 11

Because the indisputable facts demonstrate as a matter of law that the officers had probable cause to seek the charges and lack of probable cause is an element of malicious prosecution,[39] summary judgment is also appropriate on Count 11.

### 2.   Count Eight: Due Process

Martin contends that the defendants violated his constitutional right not to be deprived of liberty based on fabricated evidence.   ECF No. 1 ¶¶111-16.   The defendants counter that there is no due process right to protection against the failure to disclose exculpatory evidence, and Martin cannot prove the charges would not have been issued without the allegedly fabricated and incomplete evidence.   ECF No. 7 at 43.

### a.   Was there a Clearly Established Constitutional Right in 2009?

The Fourth Circuit distinguishes between the failure to disclose exculpatory evidence, which can not violate a suspect's due process rights, and the creation of false evidence, which can.   *Washington v. Wilmore*, 407 F.3d 274, 282 (4th Cir. 2005).[40]

---

[39] *Heron*, 361 Md. at 264, 761 A.2d at 60.

[40] The *Washington* court did not specify that the right flowed from the due process clause of the Fourteenth Amendment, but

There is a due process right "not to be deprived of liberty as a result of fabrication of evidence by a government officer acting in an investigating capacity," but there is no equivalent due process right not to be deprived of liberty as a result of the failure to disclose exculpatory evidence. *See id.* (internal quotation marks and citations omitted) ("What [the plaintiff] challenges here is not the failure to disclose exculpatory evidence, but rather the creation of false evidence.").

The right was clearly established prior to 2009. *See id.* at 283-84 (*citing Miller v. Pate*, 386 U.S. 1, 7 (1967)).

As there is no due process right not to be deprived of liberty because an officer failed to disclose exculpatory evidence, the Court will only consider allegedly fabricated evidence for Count eight.

> b.   Did the Defendants Violate that Right?

To establish a violation of the right not to be deprived of liberty based on false evidence, the plaintiff must show that (1) the defendants fabricated evidence, and (2) the fabrication "resulted in a deprivation of [Martin's] liberty." *Washington*, 407 F.3d at 282.   The causation prong is met if the deprivation of liberty "was a reasonably foreseeable result of [the defendants'] initial act of fabrication." *Id.* at 283.   "The

---

subsequent decisions have reached this conclusion. *E.g. White v. Wright*, 150 F. App'x 193, 198 (4th Cir. 2005).

initial wrongdoer might avoid liability where the intervening decision-maker would have precipitated the deprivation of liberty even in the absence of the antecedent misconduct." *Hovatter v. Widdowson*, No. CCB-03-2904, 2006 WL 890713 at *5 (D. Md. Mar. 29, 2006) (*quoting Zahrey v. Coffey*, 221 F.3d 342, 352 n.8 (2d Cir. 2000)). Accordingly, an application for charges that includes fabrications does not violate the target's due process rights if the unfabricated information supports a finding of probable cause. *Id.* at *9.

To survive a motion for summary judgment, the plaintiff must "adduce evidence showing that [the defendants] deliberately fabricated or falsified information[;] . . . unsupported allegations and speculation" are insufficient. *White v. Wright*, 150 F. App'x 193, 199 (4th Cir. 2005).

Martin contends that TFC Gussoni, "with . . . [Sgt.] Conner's approval, submitted an application for charges that contained false statements regarding Mr. Martin's driving behavior and the alleged inconsistency between the statements of Mr. Martin and his fiancé[e]." ECF No. 14 at 47. As discussed above, the inconsistency in their accounts is apparent in the recording of the stop, and, disregarding the other allegedly false information, the officers had probable cause to believe Martin was involved in gun trafficking. Accordingly, the allegedly false information was not a cause of Martin's loss of

liberty.[41]   *See Hovatter*, 2006 WL 890713, *9.   Summary judgment will be granted on Count eight.

3.   Count Nine: Retaliation

Count nine alleges that the defendants violated his First Amendment right to free speech by inducing prosecution on the gun charges in retaliation for Martin's filing of PIA requests. ECF No. 1 ¶122.   The defendants counter that the existence of probable cause for the charges is fatal to the retaliation claim.   ECF No. 7 at 44.

"A plaintiff seeking to recover for First Amendment retaliation must allege that (1) []he engaged in protected First Amendment activity, (2) the defendants took some action that adversely affected [his] First Amendment rights, and (3) there was a causal relationship between [his] protected activity and the defendants' conduct."   *Constantine v. Rectors and Visitors*

---

[41] Martin argues that his "filing of the PIA requests gave [the] Defendants a motive to fabricate evidence." ECF No. 14 at 47. Identifying a motive for fabrication is circumstantial evidence in support of a due process claim. *White*, 150 F. App'x at 199. However, TFC Gussoni issued Martin a warning describing the "driving behavior" that he allegedly falsified on the day of the stop, almost five months before MSP received the first PIA request. ECF No. 14 Attach. 4 (warning ticket dated October 12, 2009); ECF No. 14 Attach. 18 at 3 (delivery confirmation dated March 1, 2010). Likewise, the Criminal Investigation Report, dated October 12, 2009 and signed by a supervisor on October 21, 2009, contains the allegations of negligent driving and suspicious behavior during the stop that Martin claims TFC Gussoni fabricated *after* learning that Martin was making PIA requests. *See* ECF No. 14 Attach. 21 at 2; ECF No. 14 at 47.

of *George Mason Univ.*, 411 F.3d 474, 499 (4th Cir. 2005). When the alleged retaliatory action is the successful initiation of criminal charges, the existence of probable cause to believe the plaintiff committed the charge is fatal to the third element. *Hartman v. Moore*, 547 U.S. 250, 260-61 (2006); *Richter v. Maryland*, 590 F. Supp. 2d 730, 736 n.5 (D. Md. 2008).

As the officers had probable cause to seek the charges, *see supra*, Martin's retaliation claim fails as a matter of law, and summary judgment is appropriate.

4.   Count 12: Abuse of Process

Count 12 alleges that the defendants abused process by causing Martin to be charged, arrested, and detained on gun trafficking allegations. ECF No. 1 ¶¶135-42. The Maryland common law tort of abuse of process considers not the "issuance of process," but misuse of process "after it has issued." *One Thousand Fleet Ltd. P'ship v. Guerriero*, 346 Md. 29, 39, 694 A.2d 952, 956-57 (1997). To state a claim for abuse of process, the plaintiff must show: (1) "the defendant[s] wil[l]fully used process after it [w]as issued in a manner not contemplated by law," (2) the defendants acted with an "ulterior motive," and (3) the plaintiff was arrested or suffered other damages as a result of the defendants' "perverted use of process." *Id.* 346 Md. at 38, 694 A.2d at 956. The defendant must have taken "[s]ome definite act or threat not authorized by the process, or

53

aimed at an objective not legitimate in the use of process," to state an abuse of process claim--"bad motive alone" is not enough.  *Id.*

Martin contends that, after the warrant issued,[42] Sgt. Conner and TFC Gussoni "willfully abused the criminal process by misleading Pennsylvania authorities about the severity of Mr. Martin's conduct and by portraying Mr. Martin as a 'fugitive' running from the law."  ECF No. 14 at 54.  The defendants counter that TFC Gussoni "merely sought to have the usual[] criminal process used against plaintiff for its typical purpose. . . . [T]his is exactly what the law contemplates."  ECF No. 7 Attach. 2 at 47.

Martin's charge that TFC Gussoni willfully misled the PSP about the severity of Martin's conduct relates to his contention that TFC Gussoni asked the PSP to arrest Martin "as a fugitive"

> based on the arrest warrant[,] . . . false[] . . .
> [claim] that he had notified Mr. Martin of the arrest
> warrant the week of March 15, 2010, . . . [and willful
> failure to tell PSP about] the call he received from
> Mr. Martin's counsel, because he wanted to make it

---

[42] Martin contends that Sgt. Conner and TFC Gussoni willfully "obtained an arrest warrant" instead of a summons, and they did so wrongfully by making "multiple misrepresentations."  He argues that the gun trafficking charge "likely triggered the issuance of a warrant rather than a summons."  ECF No. 14 at 54. The tort of abuse of process does not consider the means of obtaining process, only "illegal use of the warrant, after it was issued, for an ulterior motive."  *DiPino v. Davis*, 354 Md. 18, 30, 729 A.2d 354, 360 (1999).  Accordingly, the validity of the warrant is not at issue in the abuse of process claim.

> appear as though Mr. Martin was evading or fleeing
> from justice.

ECF No. 1 ¶50; *see also* ECF No. 14 Attach. 27 at 3 (PSP incident
report stating that TFC Gussoni said Martin "was informed of the
warrant the week of March 15, 2010").

Even if TFC Gussoni acted with an "ulterior motive" in
providing the information he did to the PSP, he truthfully told
them that there was an arrest warrant for Martin, and it was
based on a gun trafficking charge.  TFC Gussoni made no threats,
and the only "definite [unauthorized] act[s]"[43] Martin identifies
are TFC Gussoni's (1) providing the wrong date on which Martin
learned of the warrant, and (2) failing to tell the PSP that
Martin's lawyer (who may or may not have identified himself as
Martin's lawyer) had left him a message "requesting a return
call."  ECF No. 14 Attach. 23 ¶10; ECF No. 14. Attach. 27 at 3.

Even if TFC Gussoni specifically requested that Martin "be
arrested as a fugitive," ECF No. 1 ¶50, in Pennsylvania, a
"fugitive" is a person who

> was in the demanding state when the crime was
> committed, . . . [and] thereafter he left the state
> and has been apprehended in another state. . . . It is
> not important whether the accused leaves the state to
> avoid prosecution or not.  His motive does not affect
> his relation to the law.

---

[43] *Guerriero*, 346 Md. at 38, 694 A.2d at 956 (1997).

*Commonwealth ex rel. Smalley v. Aytch*, 371 A.2d 1018, 1020-21 (Pa. Super. Ct. 1977) (*citing Appleyard v. Massachusetts*, 203 U.S. 222, 227 (1906)) (other internal quotation marks and citation omitted).[44]  Accordingly, Martin was a "fugitive" from the time the charges were authorized because he was in Pennsylvania, though he was not "on the run" from the law when he was picked up.  *Aytch*, 371 A.2d at 1020-21.

Pennsylvania's definition of fugitive renders irrelevant misstatements about when Martin learned about the charges and what Martin's attorney was doing.  Martin was charged with committing a crime in Maryland and found in Pennsylvania, making him a fugitive.  *Id.*  Accordingly, Martin has not shown a "definite [unauthorized] act" by either defendant.  *Guerriero*, 346 Md. at 38, 694 A.2d at 956 (1997).  Summary judgment for the defendants will be granted on Count 12.

H.   Conspiracy

1.   Count 10: Federal Conspiracy

Count 10 alleges that the defendants conspired to violate "the rights discussed in connection with Counts 7, 8, and 9." ECF No. 14 at 51.  As he recognizes, Martin must show that the defendants "acted jointly in concert," took an overt act "in furtherance of the conspiracy," and deprived Martin of his

---

[44] *See also Sands v. McCormick*, 502 F.3d 263, 273 (3rd Cir. 2007) (interpreting Pennsylvania law).

56

constitutional rights.  *Id.* (*quoting Hafner v. Brown*, 983 F.2d 570, 577 (4th Cir. 1992)).

As the Court found as a matter of law that Martin's constitutional rights were not violated with respect to the allegations in Counts seven, eight, and nine, *see supra*, Martin's federal conspiracy claim based on those allegations must fail.  Summary judgment will be granted for the defendants.

> 2.   Count 13: Maryland Conspiracy

Count 13 alleges that the defendants committed the common law tort of conspiracy.  ECF No. 1 ¶144.

Martin states that the Maryland conspiracy claim relates to the charges, arrest, and detention.  ECF No. 14 at 56.  Accordingly, the Court will not consider whether the defendants conspired to violate Martin's rights under Maryland law during the traffic stops.  *See id.*

The Maryland tort of civil conspiracy requires

> a combination of two or more persons by an agreement . . . to accomplish an unlawful act or to use unlawful means to accomplish an unlawful act not in itself illegal, with the further requirement that the act or means employed must result in damages to the plaintiff.

*Shenker v. Laureate Educ., Inc.*, 411 Md. 317, 351-52, 983 A.2d 408, 428 (2009) (internal quotation marks and citation omitted).  The tort "lies in the act causing the harm; the agreement to commit the act is not actionable on its own."  *Id.*, 411 Md. at

352, 983 A.2d at 428.  Accordingly, Martin must establish an
"unlawful act" to succeed on the conspiracy claim.  *See id.*

As the Court determined that the defendants' acts in
seeking the charges and, to the extent attributable to them,
obtaining an arrest warrant and Martin's detention, were not
unlawful, *see supra*, Martin cannot succeed on his Maryland
conspiracy claim, and the defendants are entitled to judgment as
a matter of law.  Summary judgment will be granted.

III. Conclusion

For the reasons stated above, the defendants' motion for
summary judgment will be granted as to Counts seven through 13,
and denied as to Counts one through six.  The remaining claims
against the defendants in their official capacities will be
dismissed.

_____3/1/12_____
Date

_____
William D. Quarles, Jr.
United States District Judge

58