IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND, NORTHERN DIVISION

DAVID K. MARTIN,                      *

          Plaintiff,                  *

          v.                          *        CIVIL NO.: WDQ-11-0881

CHRISTOPHER CONNER, et al.,           *

          Defendants.                 *
*     *     *     *     *     *     *     *     *     *     *     *     *
                    MEMORANDUM OPINION

     David Martin sued law enforcement officers Christopher

Conner and Jeremiah Gussoni (collectively, "the defendants") for

civil rights violations.  For the following reasons, the Court

will reconsider its grant of summary judgment, leave that grant

undisturbed, and deny Martin's motion for a Rule 54(b) certifi-

cation.[1]

I.   Background

     On October 12, 2009, Trooper First Class ("TFC") Gussoni, a

Trooper with the Maryland State Police ("MSP"),[2] stopped Martin,

an African-American resident of Philadelphia, Pennsylvania, in a

rented purple Hyundai ("the Hyundai") on Interstate 95 ("I-95"

or "the interstate") Southbound near mile marker 97.5 in Cecil

_____

[1] Martin's request for oral argument, ECF No. 20, will be denied
as unnecessary.

[2] TFC Gussoni is now a Special Agent with the United States
Department of Homeland Security.  ECF No. 7-4 ¶1.

County, Maryland for speeding, making an unsafe lane change, following another vehicle too closely, and negligent driving. ECF No. 1 ¶¶5-8.

TFC Gussoni ordered Martin out of the car, and patted him down for weapons.  Martin said he had no weapons on him or in the car.  ECF No. 14-5.[3]  He said he worked as an "X-ray tech" and was taking his passenger, his fiancé Lashonda Baker to Gwynn Oak, Baltimore; he did not know how to get there, but knew he had to take Interstate 695.  *Id.*  TFC Gussoni said that he had asked about firearms because he had noticed that Martin was wearing a Glock lanyard.[4]  Martin admitted that he owned a 9mm Glock compact.  *Id.*

Baker told TFC Gussoni she was going to Baltimore.  *Id.* TFC Gussoni can be heard asking, "and you guys are going to stay down there for the week?" and mentioning "your [Baker's] family."  *Id.*  Baker's responses are inaudible.  *Id.*  TFC Gussoni asked Martin how long "you guys" were staying in Baltimore; Martin responded that he was "driving her up, then coming right back to Philly."  *Id.*

---

[3] Video recording of the stop, taken from TFC Gussoni's dashboard camera.  Martin does not dispute that the video accurately reflects the events of the stop; he submitted the video in support of his opposition to the motion for summary judgment. ECF No. 14-5.

[4] Glock is an Austrian firearms manufacturer.  *See* ECF No. 14-22 at 2.

TFC Gussoni called for backup, and Sargeant ("Sgt.") Conner and TFC McCurdy arrived about 12 minutes after the initial stop. *Id.* Conner patted-down Martin and recovered a Glock 9mm handgun from his waistband. *Id.* An officer asked Martin if he was permitted to carry a handgun. He said yes, but he did not know in what state. He shook his head from side to side when asked whether he was permitted to carry a gun in Maryland. *Id.* The officer responded, "I need to know . . . whether you're permitted to carry in Maryland." *Id.*

About five minutes later, a drug-sniffing dog alerted to the trunk of the Hyundai. *Id.* Two of the officers searched the Hyundai, finding no contraband but noticing that the trunk was covered in "laundry detergent, almost." *Id.*

At the time of the arrest, Martin had a Florida concealed firearm permit in his wallet. ECF No. 7-4. He "had nothing in his possession regarding [other] licenses or permits and refused to provide any information to" the officers. *Id.* ¶30. TFC Gussoni issued Martin a warning for the traffic violations. ECF No. 14-4.

That day, Cecil County District Court Commissioner Jessica Smith reviewed TFC Gussoni's statement of probable cause and charged Martin with possessing a handgun on his person and know- ingly transporting a handgun in a vehicle, offenses punishable by up to three years imprisonment. ECF No. 7-8 at 1-2.

3

On October 14, 2009, TFC Gussoni checked the Glock's serial number with the Bureau of Alcohol, Tobacco, and Firearms ("ATF") E-trace system, which documents the ownership history of firearms.  ECF No. 14-7 at 4; ECF No. 14-22 at 2.  On November 2, 2009, ATF completed the trace; TFC Gussoni saw the results on November 20, 2009.  ECF No. 14-22 at 2; ECF No. 14-7 at 4.  The report states that on April 19, 2005, the Glock was shipped to Ciampolis Gun Shop in New Castle, Pennsylvania; on July 7, 2005, Clinton Saines, of New Castle, Pennsylvania, bought the Glock from Ciampolis; and on October 12, 2009, it was recovered on Martin.  ECF No. 14-22 at 2.[5]

After November 20, 2009, TFC Gussoni contacted ATF and asked for more information about the trace.  An agent told him that Saines was a suspected straw purchaser of firearms because of four handguns traceable to Saines, three had been recovered after use in violent crimes.  ECF No. 14-7 at 4.  TFC Gussoni says that the ATF asked for more time to investigate Saines and Martin and told him they might be charged federally for gun trafficking crimes.  *Id.*  TFC Gussoni asked the state prosecutor to *nolle prosequi* the charges so that ATF and he could further investigate Martin.  *Id.*

---

[5] Martin's purchase agreement, which was not in the officers' possession, states that he bought the gun at Ciampolis on June 10, 2006.  ECF No. 14-8.

On December 9, 2009, the Cecil County State's Attorney's office *nolle prossed* the charges. ECF No. 14-31. After Martin left the Cecil County Courthouse at the end of the proceeding, Conner stopped him on I-95 Southbound, at the 97.5 mile marker, allegedly for speeding. ECF No. 1 ¶¶13-17. When he approached Martin's window, Conner said he recognized Martin from the October stop. *Id.* ¶15. Conner smelled marijuana in Martin's rental car, but a search did not reveal drugs. ECF No. 17 ¶18.

On March 2, 2010, TFC Gussoni contacted ATF and was told that "due to lack of further investigative leads," there would not be a federal prosecution related to the gun. ECF No. 14-7 at 4.[6]

On March 4, 2010, TFC Gussoni told an investigator and an Assistant State's Attorney from Cecil County that he believed "Martin was transporting the seized Glock 26 for unlawful sale

---

[6] On February 18, 2010, Martin submitted a Public Information Act ("PIA") request to MSP, requesting

> record(s), document(s), file(s), communications, memorandum(a), order(s), agreement(s) and/or instruction(s), created, used, or in place[] on December 9, 2009 and thereafter in regard to [the stop].

ECF No. 14-19. MSP received it on March 1, 2010. *Id.* TFC Gussoni states that he was not aware of the PIA request when he contacted ATF. ECF No. 7-4 ¶28.

or trafficking." ECF No. 14-7 at 5.[7] The prosecutor agreed with TFC Gussoni, and "requested that [TFC Gussoni] apply for charges against Martin" for (1) transporting a handgun on his person; (2) knowingly transporting a handgun in a vehicle on the highways;--the two original charges—and (3) transporting a regulated firearm for unlawful sale or trafficking. *Id.* at 5. TFC Gussoni did not know that Martin had a permit to carry a firearm in Pennsylvania. ECF No. 7-4 ¶30.

On March 19, 2010, TFC Gussoni filed the charge application. ECF No. 14-7 at 1. He recounted the October 2009 stop,[8]

_____

[7] On March 3, 2010, Martin submitted a PIA request for information about the October 12, 2009 stop. ECF No. 14-20. TFC Gussoni says that he was not aware of the request. ECF No. 7-4 ¶28. MSP received that PIA request on March 5, 2010. ECF No. 14-20.

[8] He swore that: (1) on October 12, 2009, he was stationed at mile 101 on I-95, facing the southbound traffic, saw the Hyundai "traveling faster than the other vehicles," and his laser indicated that the Hyundai was traveling at 75 miles per hour[8] when it was about 1,200 feet from him; (2) after the Hyundai passed him, he pulled into traffic, and "noticed that the vehicle increased its speed and quickly exited off the Interstate onto Exit 100. This abrupt action caused a following vehicle to nearly run off the roadway"; (3) a few minutes later, he saw the Hyundai return to I-95 at the 99 mile marker and follow "less than one-half car's length from the preceding" car; (4) when he began to pursue the Hyundai, it "slowed to less than 55 miles per hour"; (5) he activated his emergency lights "for the traffic violations of" speeding, unsafe lane change, following another vehicle too closely, and negligent driving. ECF No. 14-7 at 2.
  TFC Gussoni said that after he stopped the car, he went to the passenger side of the car, enabling him "to observe more of the suspect (s) and the interior of the vehicle" and giving him "a tactical advantage for [his] safety." *Id.* He said that he

and swore that Martin's story--that he was driving Baker to her
house in Gwynn Oak, Maryland, and he would immediately return to
Philadelphia--conflicted with Baker's--that she lived in
Pennsylvania and the two were visiting her family in Baltimore
for one week. *Id.* at 3. He said that Martin told him he "did
not know where he was traveling, only that he needed to get off
'695.'" *Id.* TFC Gussoni claimed that Baker's "carotid artery
[was] pounding" when he spoke with her, and her hand trembled as
she pulled her identification card from her purse. *Id.*

It was then 11:18 a.m. and TFC Gussoni said he "believ[ed]
criminal activity was afoot" because Martin's behavior was
"inconsistent with normal interstate traffic and more indicative

---

noticed that (1) "[Martin] was staring straight ahead and was
still grip[p]ing the steering wheel," while the passenger
"look[ed] down at her clasped hands"; (2) Martin "tried not to
make eye contact" with TFC Gussoni, Martin's "body seemed
extremely tense, and carotid artery was pounding at the base of
his neck"; and (3) Martin was wearing a Glock lanyard around his
neck. *Id.* TFC Gussoni concluded that Martin's "actions were
unlike the typical motorist stopped for a traffic violation and
caused [TFC Gussoni] some concern." *Id.*

Because of the loud traffic, TFC Gussoni asked Martin to
get out of the car. TFC Gussoni said he had to ask Martin three
times to turn off the car, give TFC Gussoni the keys, and get
out, before Martin complied. He noticed that, when Martin got
out of the car, he had a "blank stare on his face," his heart
"appeared [as] if it would jump out of his neck," he tried to
"put both hands in his front [pants] pockets," and his breathing
increased." *Id.* at 3. TFC Gussoni said that, based on these
observations, he asked to "pat [Martin] down for weapons," but
Martin "began to protest and question [the] request." *Id.* TFC
Gussoni "ordered Martin to turn-around" and frisked him. *Id.*
TFC Gussoni asked Martin why he was so nervous and told Martin
he had patted him down because of Martin's acts and because he
was wearing a "Glock" lanyard. *Id.*

7

of criminal activity," so he called for backup. *Id.* TFC
Gussoni wrote that Sgt. Conner and TFC McCurdy arrived less than
three minutes later, he saw Sgt. Conner frisk Martin and
discover the loaded Glock, a dog sniffed the car and alerted,
and a follow-up search of the vehicle revealed no contraband but
powder laundry detergent-- which is "a masking agent often used
for the smuggling of" controlled substances--covering the trunk.
*Id.* at 3-4. TFC Gussoni noted in the application that he found
a Florida concealed weapon license in Martin's wallet and that
Martin "was uncooperative and would not answer questions regard-
ing the firearm or his Florida permit." *Id.* at 4.

The charge application included the E-trace results, ATF's
request for more time to investigate, and TFC Gussoni's request
that the gun possession charges be *nolle prossed*. *Id.* at 4. It
also noted that the ATF special agent told TFC Gussoni that "due
to lack of further investigative leads," Martin would not be
prosecuted federally, and "advised" him that "the events
surrounding the gun seizure from Martin are indicative of
firearms trafficking." *Id.*

TFC Gussoni noted that he had consulted with the Cecil
County Assistant State's Attorney who "agreed with the results
of this investigation and . . . requested that [he] apply for
charges against Martin for" gun possession, transporting a

handgun in a vehicle, and transporting a regulated firearm for unlawful sale or trafficking. *Id.* at 4-5.

On March 19, 2010, Martin was charged with the three offenses. ECF No. 14-7 at 6-7. On August 13, 2010, he was acquitted of the charges. ECF No. 14-30.

On April 5, 2011, Martin sued Sgt. Conner and TFC Gussoni in their individual and official capacities, asserting 13 causes of action, including deprivations of his civil rights. ECF No. 1 ¶¶59-145.[9] On July 5, 2011, the defendants moved to dismiss, or, in the alternative, for summary judgment. ECF No. 7. Martin opposed the motion; his attorney, Seth Rosenthal, Esq., filed an affidavit stating that although there was "more than sufficient" evidence to deny the motion, "discovery . . . will undermine the not-yet-tested assertions that Defendants make in their affidavits." ECF No. 14; ECF No. 14-2 ¶3. On March 1, 2012, the Court dismissed the claims against the defendants in their official capacities and granted summary judgment for the

---

[9] Martin's claims were: Counts 1, 3, 5, and 7 through 10, violations of 42 U.S.C. § 1983 (unconstitutional search and seizure (Counts 1 and 5), deprivation of equal protection (Count 3), unconstitutional seizure (Count 7), due process violation (Count 8), retaliatory prosecution (Count 9), conspiracy to deprive rights (Count 10)), Counts 2 and 6, violations of article 26 of the Maryland Declaration of Rights (unconstitutional search and seizure), Count 4, violation of article 24 of the Maryland Declaration of Rights (discriminatory classification), Count 11, malicious prosecution, Count 12, abuse of process, and Count 13, common law and Maryland Declaration of Rights conspiracy. ECF No. 1 ¶¶59-145. Counts 1 through 4 are against Sgt. Conner only. *Id.* ¶¶59-84.

defendants on counts seven through thirteen.   ECF No. 19.   On

March 15, 2012, Martin moved for reconsideration of the Court's

order granting summary judgment on counts 7, 9, 10, 11, and 13

("the gun trafficking counts".   ECF No. 20.   The defendants

opposed the motion.   ECF No. 26.   Martin has not filed a reply

to the opposition.

II.   Analysis

    A.   Motion for Reconsideration

        1.   Standard of Review

Motions for reconsideration of an interlocutory order are

governed by Rule 54(b), under which "any order or other decision

. . . may be revised at any time before the entry of a judgment

adjudicating all the claims and all the parties' rights and

liabilities."   Fed. R. Civ. P. 54(b).[10]   Thus, when warranted, a

district court retains the power to reconsider and modify its

interlocutory judgments at any time before final judgment.   *Am.*

*Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 514-15 (4th

Cir. 2003).[11]   Resolution of the motion is "committed to the

---

[10] *See Mateti v. Activus Fin., LLC*, No. DKC-08-0540, 2009 WL
3633339, *4 (D. Md. Oct. 27, 2009).

[11]   "Motions for reconsideration of interlocutory orders are not
subject to the strict standards applicable to motions for
reconsideration of a final judgment."   *Am. Canoe*, 326 F.3d at
514 (*citing* 11 James Wm. Moore et al., *Moore's Federal Practice*
§ 56.04[3] (3d ed.) ("Rule 60(b) does not govern relief from
interlocutory orders . . . .")); *see also Fayetteville Investors
v. Commercial Builders, Inc.*, 936 F.2d 1462, 1469 (4th Cir.

discretion of the district court," *Id.* at 515, and "the goal is to reach the correct judgment under law." *Netscape Commc'n Corp. v. ValueClick, Inc.,* 704 F. Supp. 2d 544, 547 (E.D. Va. 2010)(internal citations omitted).

Although Rule 60(b) applies only to final judgments, a court may consider the reasons in that rule when deciding whether to grant relief under Rule 54(b).[12] *See Fayetteville Investors v. Commercial Builders, Inc.,* 936 F.2d 1462, 1470 (4th Cir. 1991); *Mateti*, 2009 WL 3633339 at *4.

      2.   Probable Cause

The Court granted summary judgment on the gun trafficking counts because, regardless of the officers' subjective intent, there was probable cause for the charges. *See* ECF No. 18 at 44-49, 53.

"The probable cause standard 'does not demand showing that such a belief be correct or more likely true than false.'" *United States v. Williams*, 974 F.2d 480, 481 (4th Cir. 1992)

---

1991) ("An interlocutory order is subject to reconsideration at any time prior to the entry of a final judgment.").

[12] Under Rule 60(b), a court may grant relief from a judgment or order for: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence; (3) fraud or misconduct by the opposing party; (4) voidness; (5) satisfaction; or (6) any other reason that justifies relief. Fed. R. Civ. P. 60(b).

(*quoting Texas v. Brown*, 460 U.S. 730, 742 (1983) (plurality)).[13]
It "only requires enough evidence to warrant a man of reasonable
caution in the belief that an offense has been . . . committed."
*Wilkes v. Young*, 28 F.3d 1362, 1365 (4th Cir. 1994).  "[A]
defendant's innocent explanations for his odd behavior cannot
eliminate the suspicious facts from the probable cause calculus.
. . . Furthermore, the fact that any one fact . . . would not
alone support a finding of probable cause does not mean that
probable cause was absent."  *Sennett v. United States*, No. 11-
1421, 2012 WL 256065, *5 (4th Cir. Jan. 30, 2012).

A determination of probable cause requires consideration of
"the totality of the relevant circumstances."  *United States v.
Allen*, 631 F.3d 164, 172 (4th Cir. 2011) (internal quotation
marks and citations omitted).  The court must make "a practical,
commonsense decision whether, given all the circumstances . . .
there is a fair probability that" the suspect has committed a
crime."  *Id.* (internal quotation marks and citations omitted).

        3.   Rule 56(d)

As the Court noted in its earlier opinion, generally, "a
district court must refuse summary judgment wh[en] the nonmoving
party has not had the opportunity to discover information that
is essential to [his] opposition."  *Nader v. Blair*, 549 F.3d

---

[13] Probable cause requires only "a [particularized,] reasonable
ground for belief of guilt."  *Maryland v. Pringle*, 540 U.S. 366,
371 (2003) (internal quotation marks and citations omitted).

953, 961 (4th Cir. 2008) (internal quotation marks and citation omitted).  In such a case, the nonmoving party must comply with Fed. R. Civ. P. 56(d) and "set out the reasons for discovery in an affidavit." *Id.*  "The purpose of the affidavit is to ensure that the nonmoving party is invoking the protections of Rule 56[d] in good faith and to afford the trial court the showing necessary to assess the merits of a party's opposition." *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002).

Rosenthal stated that he expected discovery to reveal: (1) "how Defendant Gussoni and/or Defendant Conner learned of Mr. Martin's . . . PIA[] requests," (2) "any of the measures that Defendants took in March 2010 . . . to secure a gun trafficking charge against Mr. Martin," (3) "whether Defendants supplied misleading or incomplete information to prosecutors or a commissioner [to] obtain the charge," and (4) "identif[y] the ATF agent whom [TFO Gussoni] purportedly contacted about the possibility of lodging gun trafficking charges against Mr. Martin, . . . what [TFO] Gussoni told the agent, what the agent told [TFO] Gussoni, or when--and even whether--[TFO] Gussoni conferred with such an agent."  ECF No. 14-2 ¶¶7-8.

When he filed the Rule 56(d) affidavit, Rosenthal swore that he believed Martin had "more than" enough evidence to avoid summary judgment.  *Id.* ¶3.  The Court may deny summary judgment

under Rule 56(d) when counsel swears that he lacks "information that is essential to [his] opposition." *Nader*, 549 F.3d at 961. Rosenthal swore the opposite: that his opposition was "more than sufficient" without discovery.  ECF No. 14-2 ¶3.

Further, the evidence Rosenthal sought to discover is irrelevant to the existence of probable cause. Information about whether the officers intended to retaliate against Martin for filing the PIA requests is irrelevant because the existence of probable cause is a defense to the challenged claims, regardless of the officers' subjective intent.[14]

The "measures [the officers] took . . . to secure a gun trafficking charge," and the name of the ATF agent with whom TFO Gussoni spoke, ECF No. 14-2 ¶8, are also irrelevant to the determination of probable cause.  The type and extent of investigation is irrelevant because, as discussed below and in the Court's prior opinion, the readily available evidence demonstrated that there was probable cause to bring gun trafficking charges.  *See* Part II.A.4, *infra*.  Finally, the information "supplied . . . to prosecutors . . . [to] obtain the charge," ECF No. 14-2 ¶8, was in the affidavit supporting the charges.

---

[14] ECF No. 14-2 ¶¶4, 7; *see Hartman v. Moore*, 547 U.S. 250, 260-61 (2006); *Richter v. Maryland*, 590 F. Supp. 2d 730, 736 n.5 (D. Md. 2008).

Martin also argues that discovery is necessary to determine whether the defendants "believe[d] the gun, in fact, had 'direct ties to a suspected straw purchaser[.]'" ECF No. 20-1 at 4. The probable cause determination asks whether, objectively, a reasonable person would believe there was a fair probability of wrongdoing, not whether the officer subjectively believed a particular set of facts. *Wilkes*, 28 F.3d at 1365.

The Court has reconsidered its decision to grant the motion for summary judgment under Rule 56(d); it will not grant the requested relief.

4.   Probable Cause Determination

Martin contends that the probable cause analysis (1) "should [have] include[d] the dispositive exculpatory information that Defendants did not pursue," (2) should have excluded Martin's silence and "the warrant application's misrepresentation that Mr. Martin and his passenger gave inconsistent accounts of the length of their stay in Baltimore," and (3) was flawed because the remaining facts supporting the Court's probable cause determination are, individually, "not probative or minimally probative" of probable cause supporting a gun trafficking charge. ECF No. 20-1 at 6, 10, 13.

Martin asks the Court to "change its mind" about whether an officer must search for exculpatory evidence of which he is not aware and is not "readily available." ECF No. 20-1 at 6. The

15

Fourth Circuit has made clear that an officer is "not required to exhaust every potentially exculpatory lead" before deciding to charge a person with a crime, but may not "disregard readily available exculpatory evidence *of which he is aware*." *Wadkins v. Arnold*, 214 F.3d 535, 541 (4th Cir. 2000) (emphasis added),[15] *quoted in* ECF No. 18 at 40-41.  The Court will not change its decision to follow the Fourth Circuit's view that an officer is not responsible for exculpatory evidence unless it is readily available, *and* he is actually aware of it.  *Id.*

Martin also argues, as he did before, that the Court should not consider the allegedly inconsistent statements of Martin and Baker in its probable cause analysis, because the evidence, taken in the light most favorable to the non-movant, was that their statements were consistent.  ECF No. 20-1 at 10.  The "evidence" which Martin contends "undermin[es]" TFC Gussoni's statement that the statements were inconsistent is a statement, in Martin's opposition to the motion for summary judgment, that "Ms. Baker . . . stated that Mr. Martin was dropping her off at her family's home in Baltimore and returning to Philadelphia." ECF No. 14 at 33.  Martin supported that statement by citing the DVD recording of the stop.  *Id.*  The Court noted in its opinion on summary judgment that Baker's statements, other than that she

---

[15] *Wadkins* is a binding Fourth Circuit decision, not, as Martin indicates, a Second Circuit opinion.  *See* ECF No. 20-1 at 6.

16

was going to Baltimore, are inaudible.  ECF No. 18 at 4.  Martin

did not show a dispute of fact about TFC Gussoni's belief that

Martin and Baker gave inconsistent statements.[16]

Martin is correct that his silence should not have been

considered in the probable cause analysis.  However, that Martin

was not licensed to carry a gun in Maryland, with all the other

circumstances the Court discussed--plus TFC Gussoni's

consultation with an Assistant State's Attorney--supports the

Court's conclusion that there was probable cause to believe

Martin was transporting the gun for unlawful sale or

trafficking, or that TFC Gussoni is entitled to qualified

immunity.[17]

Martin contends that his ties to Saines, a suspected straw

purchaser, "cannot be confirmed," and therefore the link should

---

[16] The Court will not consider Baker's recent declaration that
she told TFC Gussoni that she planned to stay in Baltimore, but
Martin would return to Philadelphia immediately.  ECF No. 20-3
¶3.  Newly discovered evidence justifies reconsideration, but
not evidence that a party had before the original filing.  *See*
Fed. R. Civ. P. 60(b).

[17] *See* ECF No. 7-10 ¶4 (aff. of Assistant State's Attorney Brenda
Sexton stating that TFC Gussoni consulted her before filing an
application for charges); *Wadkins*, 214 F.3d at 541-42 (officer's
consultation with prosecutor before seeking criminal charges
"weighs heavily toward a finding that [the officer is immune]");
ECF No. 18 at 47-48 (Court's opinion discussing the factors
supporting a finding of probable cause); *id.* at 48 n.38 (Court's
opinion discussing defendants' right to qualified immunity on
the § 1983 claims--counts 7, 9, and 10 even if there was not
probable cause).

not have been considered. ECF No. 20-1 at 14. Martin is asking
the Court to change its mind about an issue he raised in
opposition to the motion for summary judgment. *See* ECF No. 14
at 39. The Court considered the evidence available to TFC
Gussoni when he filed the charge application, which was that (1)
Clinton Saines, a Pennsylvania resident, bought the gun from a
Pennsylvania gun dealership in Pennsylvania on July 7, 2005, (2)
Saines was a suspected straw purchaser of firearms, and (3) the
record of sale to Martin did not appear on the e-Trace report.
ECF No. 7-9; ECF No. 7-4 ¶22. Taken together, the facts
available to TFC Gussoni when he filed the charge report
supported his conclusion that Martin's gun had ties to a
suspected straw purchaser.[18]

Finally, Martin contends that the Court should not have
assumed the ATF investigation lasted three months. ECF No. 20-1
at 15. If the investigation took a shorter period, that would
not change the Court's conclusion that TFC Gussoni's probable
cause determination reasonably relied on the ATF investigation.
The investigation was serious enough to require that charges

---

[18] Martin offers no support for his argument that because the e-
Trace report states that its information "must be validated
prior to use in any criminal proceedings," ECF No. 7-9 at 2, it
was too unreliable for TFC Gussoni to consider it when deciding
there was probable cause to file the trafficking charge. *See*
ECF No. 20-1 at 14-15. Further, Martin offers no reason that
Gussoni's conversation with the ATF agent was not verification.
*See id.* That Gussoni's statement was "untested" does not make
it "disputed." *Id.* at 15.

were *nolle prossed* to provide time to complete that investi-
gation, and led an ATF agent to conclude that the circumstances
were consistent with gun trafficking.

The evidence before TFC Gussoni established probable cause
that Martin was involved in trafficking the Glock.  ECF No. 19
at 45-48.  That Martin was more likely than not innocent of the
charge does not negate that probable cause.  *Williams*, 974 F.2d
at 481 (probable cause does not demand a showing that the guilty
explanation is more likely than not true).  Martin's innocent
explanations for each fact supporting probable cause "cannot
eliminate the suspicious facts from the probable cause calculus.
. . . Furthermore, the fact that any one fact . . . would not
alone support a finding of probable cause does not mean that
probable cause was absent."  *Sennett*, 2012 WL 256065, *5.

The defendants are entitled to summary judgment on counts
7, 9, 10, 11, and 13.

B.   Motion for Entry of Final Judgment

Also under Fed. R. Civ. P. 54(b), the Court "may direct
entry of a final judgment as to one or more, but fewer than all,
claims . . . only if the court expressly determines that there
is no just reason for delay."  The Court may, but need not,
enter final judgment, if (1) the judgment is final: "an ultimate
disposition of an individual claim entered in the course of a
multiple claims action," and (2) "there is no just reason for

the delay in the entry of judgment." *Braswell Shipyards, Inc.*

*v. Beazer E., Inc.*, 2 F.3d 1331, 1335 (4th Cir. 1993).

Certification of final judgment is "the exception rather than

the norm," *id.*, a "remedy [that] should be reserved for the

infrequent harsh case," *Curtiss-Wright Corp. v. Gen. Electric

Co.*, 446 U.S. 1, 5 (1980). "It will be a rare case whe[n] Rule

54(b) can appropriately be applied when the contestants on

appeal remain contestants below." *Braswell Shipyards*, 2 F.3d at

1336-37 (internal quotation marks and citation omitted).

The defendants do not contest the finality of summary

judgment. ECF No. 26 at 12-16. They contend that there is just

reason for waiting to enter judgment until all the claims are

decided. *Id.* at 14-15.

To decide whether there is just reason for delay, the Court

may consider, if applicable:

> (1) the relationship between the adjudicated and
> unadjudicated claims; (2) the possibility that the
> need for review might or might not be mooted by future
> developments in the district court; (3) the possibil-
> ity that the reviewing court might be obliged to
> consider the same issue a second time; (4) the pre-
> sence or absence of a claim or counterclaim which
> could result in a set-off against the judgment sought
> to be made final; (5) miscellaneous factors such as
> delay, economic and solvency considerations, shorten-
> ing the time of trial, frivolity of competing claims,
> expense, and the like.

*Braswell Shipyards*, 2 F.3d at 1335-36 (internal quotation marks

and citation omitted). The district court must set forth "clear

and cogent findings of fact" in the certification decision, *id.* at 1336, but need not discuss each *Braswell* factor.[19]

Claims are "completely distinct" when they are "founded upon . . . different facts and controlled by different law."[20] If "[d]ifferent evidence is required to prove" the claims, and "the success of one party on its claims, is, at most minimally relevant to the success on the [other] claims," this factor favors entering final judgment.[21]

Martin contends that the counts pending in this Court are about the defendants' conduct leading to the October 12 and December 9, 2009 stops and searches of Martin, and the gun trafficking counts consider the defendants' conduct in March and April of 2010; therefore, he says, the claims are "entirely separable." ECF No. 20-1 at 18 (internal quotation marks omitted). The defendants counter that Martin's claims all "revolve around the car stops and what was found during th[o]se

---

[19] *See, e.g.*, *CapitalSource Fin., LLC v. Delco Oil, Inc.*, No. 06-2706-DKC, 2010 WL 3722934, *6 (D. Md. Sep. 20, 2010) (discussing likelihood that defendant, against whom had been entered, would become insolvent before the conclusion of the case, and lack of chance of offset, to justify Rule 54(b) certification).

[20] *E.I. du Pont de Nemours and Co. v. Kolon Indus., Inc.*, No. 09-0058, 2010 WL 427879, *2-3 (E.D. Va. Feb. 3, 2010) (finding that the defendant's antitrust counterclaims were "fully separate and distinct" from the plaintiff's "trade-secret-driven claims").

[21] *Kolon*, 2010 WL 427879, *3.

stops," and are thus too closely related to separate by partial judgment.  ECF No. 26 at 14.

As Martin recognizes, facts about

the alleged conduct giving rise to the [adjudicated] counts. . . could help to establish that [the] Defendants knew that their conduct during the stops/searches at issue in Counts 1 - 6 [was] improper and, as a result, could help to establish that the alleged violations of law in fact occurred.

ECF No. 20-1 at 19.  This suggests that the adjudicated claims are intertwined with the remaining claims--which counsels against certification.  It also suggests that the Fourth Circuit would be required to review the same issues on interlocutory and final appeals, if, as Martin contends, the facts relevant to the gun trafficking claims include facts relevant to the remaining claims.

Future developments in this case will not moot the need for the Fourth Circuit to review the Court's grant of summary judgment, and there are no counterclaims--and no award--to offset.  *See Braswell*, 2 F.3d at 1335-36.

Because few of the *Braswell* factors support a Rule 54(b) certification, and there is a strong presumption against certification when the same parties would be required to

litigate here and before the Fourth Circuit,[22] the Court will deny Martin's motion for certification.

III. Conclusion

For the reasons stated above, the Court reconsidered its grant of summary judgment; it will leave that grant undisturbed, and deny Martin's motion for a Rule 54(b) certification.

_____8/20/_____
Date

_____
William D. Quarles, Jr.
United States District Judge

---

[22] *See Curtiss-Wright*, 446 U.S. at 5; *Braswell Shipyards*, 2 F.3d at 1336-37.